OPINION OF THE COURT
Louis B. York, J.
This is a CPLR article 78 proceeding challenging the March 6, 2003 determination by the Metropolitan Transportation Authority’s Board of Directors (the Board) to raise subway, bus and commuter railroad fares, and scale back or close certain station booths. For the reasons below, the court grants the petition, declares the notice and the Board vote invalid, vacates the vote in question except as it relates to the tolls pertaining to the Triborough Bridge and Tunnel Authority (TBTA), and remands to the Metropolitan Transportation Authority for proceedings consistent with this decision.
Facts
The New York State Metropolitan Transportation Authority and the other respondents (collectively, MTA) run New York City’s subways and buses, certain of its bridges and tunnels, and the commuter railroads in the 12-county transportation district which includes the five counties within New York City along with Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, and Westchester Counties. The MTA carries approximately one third of the transit riders in the United States, or around 2.3 billion riders each year (Hevesi exhibit K).
On November 22, 2002, the MTA announced at a public Board meeting that it would end fiscal year 2002 with a budget *504 surplus of $24.6 million and a $2.8 billion deficit for fiscal years 2003-2004. On December 18, 2002, the MTA approved an interim financial plan for 2003-2004 (the December Plan) reiterating the financial information announced on November 22, asserting that the $2.8 billion deficit would be reduced to $951 million based upon cost-saving measures enacted within the MTA, and calling for subway, bus and commuter railroad fare increases of up to 33% beginning in 2003 along with subway token booth closings (see Hevesi exhibit B).
The MTA is required by statute to hold a public hearing when it is contemplating changing fees for the transportation of passengers (see Public Authorities Law § 1266 [3]). The New York City Transit Authority (TA) is required to hold a public hearing if it is contemplating a complete or partial closing of a passenger station within the City of New York (see Public Authorities Law § 1205 [5]). The parties dispute the necessity of holding a public hearing when the TA contemplates a fare increase. Regardless, the MTA and TA chose to include the subway fare increases in the notice and to address these proposed changes at the hearings.
In January 2003 the MTA issued notices of public hearings (the notice). In its “Introduction/Overview,” the notice stated:
“In November 2002, the MTA published its two-year Financial Plan for 2003 and 2004 in which it projected a combined gross deficit of $2.8 billion. Numerous internal actions have been identified, including administrative reductions and cost-saving measures such as the closing [of] some token booths and the elimination of the token, as a means to reduce this deficit to an estimated $1 billion. This remaining deficit is proposed to be addressed by one of the three options described below, which include combinations of fare and toll increases, service reductions, and/or increased governmental assistance. Public comments are being solicited on these proposals through a series of hearings throughout the region as noted below. Comments can also be submitted via e-mail * * *” (exhibit A to amended petition).
The notice invited “customers * * * to comment on the proposed fare and toll increases and subway station closings to help close a projected MTA budget gap of $2.8 billion for 2003 and 2004” within the parameters of the three stated options (id.).
*505 In February 2003, 10 public hearings were held throughout the region serviced by the MTA, including the five boroughs of New York City. On March 6,2003, after the hearings concluded, the Board voted to approve the following: a 33% increase in subway and bus fares; elimination of the token; a 25% average increase in commuter railroad fares; an increase in bridge and tunnel tolls; higher fares for other services such as express buses; and a scaling back or closing of not more than 62 token booths.
Meanwhile, the announcement regarding the MTA’s sparse financial resources was met with surprise. Prior to the announcement, there was a general belief that the MTA currently enjoyed a large surplus. Concerned, the New York State Comptroller, Alan G. Hevesi, undertook an examination of the MTA’s finances. According to Comptroller Hevesi, his initial requests to the MTA for financial information were fruitless and he was forced to issue subpoenas on February 19, 2003 for records and testimony from MTA officials in order to obtain the information (see Hevesi affidavit, Apr. 29, 2003, 2-7). In early January 2003, following his receipt of the records, the State Comptroller commenced an audit of the MTA’s finances, focusing on the December Plan.
On April 23, 2003, the State Comptroller released a report of his audit of the financial affairs of the MTA (Hevesi exhibit K; the Hevesi Report). The Hevesi Report found that the MTA “had two versions of its December Plan: the one it showed the public and the one it kept to itself’ (the Internal Plan). The Internal Plan revealed that, instead of ending 2002 with a surplus of $24.6 million, the MTA actually had a surplus of $537.1 million. However, through previously undisclosed material transactions, which the Hevesi Report characterizes as “secret transactions,” the MTA moved resources off the 2002 budget to cover expenses in 2003 and 2004. In particular, the MTA transferred $182.5 million of the surplus to an “off-budget reserve” that would be drawn down in 2003 and $125 million to a similar reserve for 2004. In addition, the MTA planned to prepay future debt service costs in 2002 by $205 million, effectively transferring $65.8 million to 2003 and $139.2 million to 2004 for this purpose. These transactions created the $512.5 million budget gap.
Based on this information, the report concluded that, “[wjhile it would have been imprudent to use all of the [$537.1 million] surplus resources in 2003, there was far more flexibility in the size and timing of the fare hike than was acknowledged by the *506 MTA.” (Id.) The report further stated that the MTA’s failure to disclose the available resources to the public and its elected officials foreclosed public consideration of options other than those proffered by the MTA and stifled public debate. Furthermore, the MTA Director of Budgets and Financial Management did not recall advising the Board, which voted on the increases and the booth closings, of the actual surplus. Thus, the Comptroller concluded that “the public hearings were, in effect, a sham because the public and its elected officials did not have the information necessary to make informed comments about the December Plan” (Hevesi exhibit K at 22).
The New York City Comptroller, William C. Thompson, Jr., also issued a report on April 23, 2003 (the Thompson Report) stating that the TA “did not provide the public with complete, clear, and accurate information about its current and future financial position,” that the TA’s operating budget proposal lacked essential information, and that it was “impossible for all concerned parties to assess the financial position of the Transit Authority and make an informed judgment about the necessity for a fare increase” (see Rose exhibit A at 2).
Petitioners commenced this proceeding by order to show cause dated April 30, 2003. Their allegations rely heavily on the findings set forth in the Hevesi and Thompson Reports. Petitioners seek to enjoin the fare increase based on their core contention that the public hearings were a sham because they were based on the allegedly false financial information from the December Plan disseminated to the public in the notice. They argue that the Board’s vote, which they assert is based on the allegedly misleading December Plan and on the invalid public hearings, is invalid as well. Petitioners’ goal is to obtain a vacatur of the fare hike pending new public hearings and a new Board vote, both of which, they contend, should be based on accurate financial information.
On May 2, 2003, after a hearing on petitioners’ request for a temporary restraining order (TRO), this court issued an interim order in which it declined to grant the TRO and scheduled a hearing on petitioners’ request for a preliminary injunction for May 9, 2003. In the interim, the court advised the parties of its intention to address the merits of petitioners’ claims on an expedited basis. Toward this purpose, petitioners withdrew their request for a preliminary injunction, and the parties agreed to have all the claims adjudicated in the context of an article 78 proceeding. Respondents also cross-moved to dismiss the petition and asked the court to consider their cross-moving *507 papers as an answer to the petition. The court granted this request, and also granted the application of Roger Toussaint, the president of Local 100 of the Transport Workers Union, to intervene in the litigation.
On May 9, the court held a hearing on the merits of the petition and respondents’ cross motion. At that hearing, petitioners made the following arguments: the public hearings conducted by the MTA were a sham because the public and elected officials were given false financial information by the MTA; the MTA kept two sets of books — the December Plan for the public and the Internal Plan for the MTA; the three fare increase and cost reduction options presented to the public in the notice could have been broadened and mitigated if they had been based on a true picture of the MTA’s finances; the MTA’s statement that it was facing a $2.8 billion deficit discouraged members of the public and elected officials from attending or testifying at the hearings; and the MTA’s false representation of its financial position was in violation of lawful procedure. Petitioners also alleged that respondents failed to maintain and file five-year budgets with the Governor on an annual basis, as required by Public Authorities Law § 1269-d. They set forth this failure in their petition, and they seek declaratory and injunctive relief with respect to this violation as well.
In opposition and in support of its cross motion to dismiss the petition, the MTA argued that it fully complied with the statutory notice requirements, and that no one disputes that the MTA needed to implement fare increases and cost-cutting measures. Respondents also challenge the contention that it kept two sets of books. Instead, it explains that the December Plan comprised a summary of the so-called “secret” books; that it was not required to share these books with the public or the Board; and that the MTA’s management of its budget is not subject to scrutiny by the public or the courts. Finally, respondents asserted that any violations of Public Authorities Law § 1269-d can only be challenged by the Comptroller or by the Governor, with whom the five-year budgets must be filed.
Discussion
Initially, the court must address the threshold issues of standing and justiciability that respondents raise (see New York County Lawyers’ Assn. v Pataki, 188 Misc 2d 776, 779 [Sup Ct, NY County 2001], affd 294 AD2d 69 [1st Dept 2002]).
A party must have standing to bring a lawsuit. Standing relates to the issue of whether the party that seeks relief has *508 “a sufficiently cognizable stake in the outcome” (Council of City of N.Y. v Giuliani, 183 Misc 2d 799, 806 [Sup Ct, Queens County 1999]). It is not sufficient that the issue is one of vital public concern (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769 [1991]). Instead, to evaluate standing the court must determine whether the party seeking relief has sustained an injury. (Mahoney v Pataki, 98 NY2d 45, 52 [2002].) The injury must also be tied to the administrate act that is being challenged (Society of Plastics Indus., 77 NY2d at 773).
The court is satisfied that the individuals named as petitioners, who are all transit riders, have standing to challenge the fare hikes and booth closings because they are affected directly by the proposed changes (Sheldon v New York City Tr. Auth., 39 AD2d 950 [2d Dept 1972]; see also Matter of Town of Islip v Long Is. Power Auth., 301 AD2d 1, 9 [2d Dept 2002] [petitioners demonstrated injury, for standing purposes, by showing that amounts they would have paid due to surcharge exceeded amounts they would have had to pay if refunds had been charged back], lv denied 99 NY2d 506 [2003]). Petitioner Alexander Wood, Executive Director of the Disabilities Network of New York City, has standing to challenge the subway booth closings (see New York Urban League v State of New York, 71 F3d 1031 [2d Cir 1995]), as does petitioner-intervenor, who asserts the rights of the MTA employees who may be affected by the closings. Moreover, the Straphangers organization, which is part of New York Public Interest Research Group, appears to have organizational standing (see New York Pub. Interest Research Group v Insurance Info. Inst., 140 Misc 2d 920 [Sup Ct, NY County 1988], affd 161 AD2d 204 [1st Dept 1990]; New York Pub. Interest Research Group v Whitman, 321 F3d 316, 324-325 [2d Cir 2003] [Whitman]). It also asserts specific injury based on its increased transit check costs due to the fare hikes. The Straphangers added the individually named petitioners following questioning by the court about the standing issue. Under the test for associational standing, because individual members of the association participate in the litigation, the association may no longer be necessary as a party (see Whitman, 321 F3d at 324-325). This issue is not crucial because, at any rate, collectively the petitioners have asserted a sufficient basis for standing. In addition, the court does not reach the issue of the legislative standing of petitioner David A. Paterson, a State Senator, or address the constitutional arguments he raises (see Matter of Fanelli v Spence-Chapin Agency, 153 AD2d 625, 627 *509 [2d Dept 1989]; People v Rodriguez, 193 Misc 2d 725, 727 [Sup Ct, Kings County 2002]).
Justiciability, in general, involves the question of which matters may be resolved by the judicial as opposed to the executive or legislative branches or their extensions (New York County Lawyers’ Assn. v State of New York, 294 AD2d 69, 72 [1st Dept 2002]). The principle of justiciability ensures that the judiciary neither intrudes upon nor usurps the powers allocated to the other two branches of government, and holds that courts only have the power to decide what are deemed to be “judicially manageable questions.” (Matter of Boung Jae Jang v Brown, 161 AD2d 49, 54 [2d Dept 1990].) However, the fact that a case “may have political overtones, involve public policy, or implicate some seemingly internal affairs of the executive or legislative branches” does not, by itself, render the matter nonjusticiable (id. at 55). Instead, the court must be allowed to perform its vital function of ensuring that the other two branches of government are complying with their legal mandates.
Initially, the court finds that the sufficiency of the notice and adequacy of the hearing are justiciable matters. “Where * * * notice and a hearing are prescribed by statute, the courts have consistently held that rate-making orders * * * are ‘judicial’ in the sense that they are reviewable * * *” (Matter of Lakeland Water Dist. v Onondaga County Water Auth., 24 NY2d 400, 407 [1969]). Indeed, as respondents clarified at oral argument, they do not seriously dispute the justiciability of this matter in a general sense. Instead, their assertion is that this court cannot review the financial determinations of the MTA and its subsidiaries, including the decisions to close or partially close subway booths and to alter transit fares. The court agrees with respondents that it is “ill equipped to run a railroad” and has no power to evaluate an MTA decision that a fare increase is economically necessary (Stein v Metropolitan Transp. Auth., 110 Misc 2d 1027, 1028-1029 [Sup Ct, Nassau County 1981]).
This does not end the inquiry, however. Courts do have the power to review challenges based on allegations that officials and administrative bodies did not abide by “procedural safeguards which have been developed to protect the citizenry” (id. at 1029). In the case before the court, petitioners do not ask the court to substitute the court’s judgment or that of others, including petitioners, for that of the MTA. Instead, they ask the court “to determine whether MTA operated and determined according to the authority and powers bestowed *510 upon it by the legislature” (Matter of County of Nassau v Metropolitan Transp. Auth., 57 Misc 2d 1025, 1030 [Sup Ct, Nassau County 1968]). And, as shown above, petitioners have the right to challenge — and the court has the power to determine — whether the MTA exercised its judgment in accordance with the statutory standards (Sheldon, 39 AD2d 950). This includes a challenge based on the MTA’s allegedly defective notice of public hearing (Stein, 110 Misc 2d at 1029).
Respondents’ argument on standing is more sophisticated than suggested above. They argue that petitioners are attempting to create and impose substantive controls in connection with the notice. In particular, respondents allege that petitioners want to create the requirement that respondents open their financial records for public review every time they decide it is necessary to raise fares or to close subway booths. They claim that they had no obligation to share any of these records — but that, at any rate, they included adequate and accurate financial information when they summarized the December Plan in the notice. Because neither the courts nor the public have the authority to second-guess the MTA’s economic decisions — such as the so-called “secret” decisions to prepay future debt service costs or to transfer 2002 funds to the 2003 and 2004 budgets— respondents contend that the court has no power to evaluate the financial information included in the notice, let alone to declare the notice invalid on this basis.
Ultimately, this argument must fail. For one thing, courts must have the power to evaluate government actions when serious questions are raised as to whether the actors complied with the law. Although the judiciary must take great care not to overreach in its decision-making process — for example, by evaluating the discretionary budgetary decisions of the MTA— the legislative and executive branches cannot insulate their actions from review based on their discretionary nature. To do so would dangerously diminish the capacity for public oversight by eliminating the possibility of viable challenges such as the one before this court. For another thing, respondents’ argument distorts the nature of petitioners’ challenge. Petitioners are not asking for the right to review respondents’ books regularly and to second-guess every financial decision. Nor are they bringing this proceeding because respondents understated the surplus by a negligible amount or made a minor bookkeeping error. Instead, they ask this court not to allow procedures to stand that were based on the misstatement — which respondents made to the public, in the notice, and to their Board— *511 that the 2002 surplus was approximately 1/22 of the actual amount in the MTA coffers.
Though the court finds the matter justiciable, it does note that it has no power to address the portion of the MTA vote that relates to bridge and tunnel tolls. Most significantly, petitioners did not name the Triborough Bridge and Tunnel Authority as a respondent in this proceeding, and counsel for the named respondents clarified that they were not authorized to accept papers or to proceed on behalf of the TBTA. Because the TBTA had no notice or knowledge of the proceedings at hand, this court has no power to make a ruling which affects the TBTA. Even if this were not the case, the petition does not specifically address the bridge and tunnel tolls, and no petitioner asserts specific standing as to these tolls. Contrary to petitioners’ counsel’s assertion, the fact that these tolls were part of the same vote that is being challenged is insufficient.
The court also agrees with respondents that it should not address the violations of Public Authorities Law § 1269-d. This law obliges the MTA to file annual financial plans with the Governor, and petitioners have not adequately answered the court’s concerns regarding their standing to raise this challenge. Moreover, respondents have argued that the Comptroller is instituting stricter measures to ensure future compliance. This, coupled with the fact that the MTA has now filed this year’s version of the five-year plan, renders the matter moot, obviating the need for judicial intrusion.
Having resolved these threshold issues, the court turns to the dispute at hand. Any public hearing notice given by the MTA or the TA must comply with strict statutory requirements concerning language, content and format. Both the MTA’s and the TA’s notices must
“(a) be written in a clear and coherent manner using words with common and every day meaning; (b) be captioned in large point type bold lettering with a title that fairly and accurately conveys the basic nature of such change or changes; (c) where such change involves a proposed change in levels of fare, include in its title the range of amounts of fare changes under consideration; (d) contain, to the extent practicable, a concise description of the specific nature of the change or changes, including * * * a concise description of those changes that affect the largest number of passengers; (e) where such change involves a change in the nature of a *512 route, contain, to the extent practicable, a clear graphic illustration of such change or changes; and (f) where such change involves a partial or complete station closing, such notice shall be posted at the affected station with a clear graphic illustration depicting the nature of [the] closing * * *” (Public Authorities Law § 1263 [9]; § 1205 [7]).
These requirements apply even if the hearings are not mandatory. Thus, the court need not determine whether the TA had to conduct public hearings on its proposed fare changes.
It is undisputed that the notice complied with these requirements in a technical sense. The notice states the intention to raise fares and close subway station booths, lists the three basic options under consideration, and sets forth a list of the station booths that might be affected by full or partial closings. Respondents argue that, because the notice is facially compliant, the court must dismiss petitioners’ challenge.
However, in so asserting, respondents disregard the underlying purposes of the laws at hand. The right to a public hearing and to public scrutiny is based on the principle of fundamental fairness which is required of all governmental agencies, officers and employees when dealing with the citizens of the state or their affairs (Glen v Rockefeller, 61 Misc 2d 942, 949 [Sup Ct, NY County 1970], affd 34 AD2d 930 [1st Dept 1970]; see also Orbach v New York State Urban Dev. Corp., 110 Misc 2d 720, 724 [Sup Ct, NY County 1981] [where conduct at hearing discouraged questions by the public, officials defeated purpose of public hearing and new hearing was required]). The hearing provisions governing the MTA are likewise remedial in nature, and this court cannot subject them to an “unduly restrictive construction.” (Matter of New York Pub. Interest Research Group Straphangers Campaign v Reuter, 293 AD2d 160, 165 [1st Dept 2002] [regarding requirement that hearings be held prior to station or access point closings, in decision reading this requirement as extending to closing of station booths].) In particular, the hearings at issue aimed to help the MTA develop a reasonable fare structure within its budgetary confines, and to “afford to the public in attendance an expression of views on the subject of fare increases” and that of subway booth closings (Matter of Educational Broadcasting Corp. v Ronan, 68 Misc 2d 776, 778 [Sup Ct, NY County 1972]).
Because the public learns of these hearings through the notices posted by the MTA, the notice requirement is also extremely significant. The function of a notice of a public hear *513 ing is “to advise the public of the subject matter of the [proposals] in order that interested persons might attend the hearing and urge their objections to the approval of the [changes] (Garlen v City of Glen Falls, 17 AD2d 277, 278 [3d Dept 1962], affd 12 NY2d 1025; see Matter of U.S. Healthcare v Curiale, 162 Misc 2d 833 [Sup Ct, NY County 1994].) Often, “[t]he published notice is the fundamental vehicle for communicating [the proposed changes] to the public * * *” (Coutant v Town of Poughkeepsie, 69 AD2d 506, 511 [2d Dept 1979]). Therefore, it is crucial that it is clearly written and is unambiguous (id.), and that the language of a notice is not deceptive or misleading or otherwise written so as to thwart the underlying purpose of the notice requirement (Reizel, Inc. v Exxon Corp., 42 AD2d 500, 506 [2d Dept 1973], affd 36 NY2d 888 [1975]; see also 41 Kew Gardens Rd. Assoc. v Tyburski, 124 AD2d 553, 554 [2d Dept 1986], lv denied 68 NY2d 612 [1986]). The notice is inadequate if it “mislead [s] interested parties into foregoing attendance at the public hearing” (Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 678 [1996]) or discourages them from expressing their views in full (see Reizel, 42 AD2d at 506). Finally, any doubts concerning sufficiency must be resolved against the notice. (Matter of Gardiner v Lo Grande, 92 AD2d 611, 612 [2d Dept 1983], affd 60 NY2d 673 [1983].)
In light of this standard, the court concludes that the notice is defective. The notice stated that the MTA faced a $2.8 billion deficit for 2003-2004. This statement was based on the financial conclusions contained in the December Plan. It appears that at the time the December Plan was presented, the MTA had the Internal Plan which, among other things, shifted existing resources from 2002 to 2003 and 2004, reduced the 2002 surplus by $513.5 million, and presented the dramatically altered budget to the Board and to the public. Nevertheless, the notice invited the public to attend public hearings “to help close a projected MTA budget gap of $2.8 billion for 2003 and 2004” and offered three options to the public predicated on that gap. In addition, it presented the December Plan to the Board, and offered it these three options.
The court finds that the hearings were based on the false and misleading premise that the MTA was in worse financial condition than it knew itself to be, and that the notice wrongfully relegated the public to the role of assisting the MTA in closing a “budget gap of $2.8 billion” which did not exist, and presenting their views on the three options based on their misinformation about that fictitious gap.
*514 Moreover, the misleading information that the MTA included in the notice had a chilling effect on the public, discouraging an open and complete discussion of the proposals and foreclosing the presentation of creative alternatives in light of the actual surplus. Petitioners have shown examples of this negative impact. Petitioner Alexander Wood, Executive Director of the Disabilities Network of New York City, states in his April 29, 2003 affidavit that he and four other advocates for the disabilities community were influenced to forego testimony at a public hearing because the MTA stated that it faced a $2.8 billion deficit. This is but one example of similar affidavits before the court. In addition, Eric Schneiderman, a State Senator and one of the attorneys representing petitioners, stated on the record that he testified at the public hearings at issue, and that his testimony would have been quite different if he had been aware of the facts.
Respondents argue that they had no obligation to provide a fuller financial picture to the public because the public had no power to alter the MTA’s determinations to prepay future debt services or to make other financial decisions. Moreover, for this same reason the MTA was entitled to treat the December Plan as a “fait accompli.” That is, the decision to shift over a half billion dollars out of the 2002 budget, leaving it with only $24.6 million, was final, not subject to review by the public, the Board, or the courts; and, therefore, by notifying the public and the Board that the MTA ended 2002 with only $24.6 million in its coffers, it presented both groups with accurate information.
Despite the persuasive nature of the above argument, the court must reject it, for it overlooks the purpose of the public hearings. As already stated, they assist the MTA in developing a reasonable fare structure, and they afford the public an open forum in which to express their views. (See Educational Broadcasting Corp., 68 Misc 2d at 777-778.) Neither of these purposes can be fully realized unless the forum which transpires is based on accurate information. In addition, although under the Public Authorities Law the MTA has the power to set the rates and fares for itself and its subsidiaries, this power is subject to “certain safeguards * * * and after a public hearing” (County of Nassau, 57 Misc 2d at 1028-1029). If this court did not enforce the implicit and concomitant requirement that the MTA provide the public in attendance at public hearings with accurate information, then it would greatly diminish the value of one of these crucial safeguards. In addition, “a fair *515 and open hearing is essential to the legal validity of administrative agency and maintenance of public confidence therein” (Orbach, 110 Misc 2d at 723). By presenting information which misled the public and the Board as to the current financial status of respondents, respondents undermined the public’s confidence in the MTA. If this court did not declare the notice and the vote invalid, it would exacerbate the harm — and undermine the public’s confidence in the judiciary as well.
Nothing in respondents’ arguments persuades this court of the contrary. Indeed, at oral argument, counsel for the MTA stated that, after listening at the public hearings to people who voiced their concern over the numerous subway booth closings, the MTA opted to adjust its plan, reducing the closings and increasing the fare hikes to compensate for the expense of operating more booths. As petitioners noted, this only underscores the benefit of holding public hearings based on adequate information. Had the public known of the true state of the budget, its members could have participated more meaningfully in the hearings.
Because of the above, the notice was inaccurate in ways which “resulted in the frustration of the purpose and intent of the applicable * * * requirements.” (41 Kew Gardens Rd. Assoc., 124 AD2d at 554.) Moreover, because of the importance of the notice requirement, once the notice that preceded the public hearing is deemed invalid, the subsequent administrative determination must also be considered arbitrary and capricious, and thus it cannot stand (see Healthcare, 162 Misc 2d at 839). Therefore, since the hearings were fundamentally flawed by the misleading notice, the March 6, 2003 determination of the Board, which was purportedly predicated in part on the public’s testimony at the hearings, was made in violation of lawful procedure (see CPLR 7803 [3]). Furthermore, the Board’s March 6 determination must be “rationally based” to avoid judicial scrutiny (see Matter of Pell v Board of Educ., 34 NY2d 222, 230 [1974]). As stated, the Board also was presented with misleading financial information and had the impression that the MTA’s coffers contained over a half billion dollars less than they actually did. A determination based on numbers — here, dollars — cannot be rationally based if the numbers themselves are wrong.
It must be emphasized that no one is questioning respondents’ right to raise fares or to enact cost-cutting measures or to manage their budgets. For this reason, the court rejects, without consideration, petitioners’ arguments concerning *516 whether the cost-cutting measures and fare hikes are necessary to maintain the MTA as a self-sustaining entity. Moreover, as petitioners themselves concede, the measures may be prudent ones, and may ultimately be adopted in part or in whole. Respondents’ rights do not, however, include the right to misinform the public which they serve. And when they act in blatant disregard of this principle, the resulting action is invalid; and the courts, in face of a challenge, cannot allow the determination to stand. i
Conclusion
The court concludes that the Board’s March 6, 2003 determination should be vacated because the determination was reached in violation of lawful procedure and not rationally based. As a result, the May 2003 fare increases implemented pursuant to the Board’s March 6 determination will be rolled back to the date of the increase. In order to allow respondents to implement the changes efficiently, the court will allow them two weeks to roll back the fares.
Accordingly, it is ordered and adjudged that the petition is granted to the extent that it relates to Metropolitan Transportation Authority, also known as MTA, New York City Transit Authority, Long Island Railroad, Metro-North Railroad, Staten Island Rapid Transit Operating Authority and Long Island Bus Company, and that it seeks a declaration as to the notice and subsequent vote relating to these respondents; and it is further ordered and adjudged that the notice is declared to be invalid, and the portions of the March 6 vote enacting the subway, bus and commuter transit fare hikes involving the respondents listed above and directing the closings of 62 token booths is vacated, and the fares shall all be rolled back to their prior levels by May 28, 2003; and it is further ordered that the matter is remanded to the MTA to undertake all necessary procedures, including new hearings, consistent with-the court’s determination; and it is further ordered that respondents’ cross motion to dismiss the petition is denied except with respect to the portion of the petition seeking rulings with respect to respondents’ alleged violations of Public Authorities Law § 1269-d.