[763 NYS2d 13]

In the Matter of NEW YORK PUBLIC INTEREST RESEARCH GROUP STRAPHANGERS CAMPAIGN, INC., et al., Respondents, and ROGER TOUSSAINT, as President of Local 100, Transport Workers Union of America, Intervenor-Respondent, v METROPOLITAN TRANSPORTATION AUTHORITY et al., Appellants.

In the Matter of AUTOMOBILE CLUB OF NEW YORK, INC., Respondent, and VITO FOSSELLA et al., Intervenors-Respondents-Appellants, v METROPOLITAN TRANSPORTATION AUTHORITY et al., Appellants-Respondents.

First Department, July 15, 2003

128

## APPEARANCES OF COUNSEL

*Brian O'Dwyer* and *Eric Schneiderman* of counsel *(Gary Silverman, Laura Gentile, Steven Aripotch, Thomas Shanahan, Gene Russianoff* and *Anthony LoPresti* on the brief; *O'Dwyer & Bernstien, LLP, Eric Schneiderman, Shanahan & Associates, P.C.,* and *Davidson & LoPresti,* attorneys), for respondents in first above-entitled proceeding.

*Arthur Z. Schwartz* of counsel *(Daniel R. Bright* on the brief; *Kennedy, Schwartz & Cure, P.C.,* attorneys), for intervenor-respondent in first above-entitled proceeding.

*Stephen Rackow Kaye* and *Gregg M. Mashberg* of counsel *(Charles S. Sims, Karen D. Coombs* and *James H. Freeman* on the brief; *Proskauer Rose LLP, Catherine A. Rinaldi, General Counsel,* and *Roger J. Schiera, Assistant General Counsel,*

*Metropolitan Transportation Authority, Martin B. Schnabel, Vice President* and *General Counsel,* and *Florence Dean, Executive Assistant General Counsel,* and *New York City Transit Authority,* attorneys), for appellants in first above-entitled proceeding.

*Anthony S. Genovese* of counsel *(Michael F. Fitzgerald* and *Bradley F. Silverman* on the brief; *Robinson Brog Leinwand Greene Genovese & Gluck, P.C.,* attorneys), for respondent in second above-entitled proceeding.

*Robert Allan Muir, Jr.,* of counsel *(Robert Allan Muir & Associates, LLP,* attorneys), for intervenors-respondents-appellants in second above-entitled proceeding.

*Stephen Rackow Kaye* and *Gregg M. Mashberg* of counsel *(Charles S. Sims, Karen D. Coombs* and *James H. Freeman* on the brief; *Proskauer Rose LLP, Catherine A. Rinaldi, General Counsel,* and *Roger J. Schiera, Assistant General Counsel, Metropolitan Transportation Authority, Robert M. O'Brien, Vice President* and *General Counsel,* and *M. Margaret Terry, Deputy General Counsel, Triborough Bridge and Tunnel Authority,* attorneys), for appellants-respondents in second above-entitled proceeding.

## OPINION OF THE COURT

ROSENBERGER, J.

These CPLR article 78 proceedings, which have been consolidated for purposes of appeal, were commenced by the New York Public Interest Research Group Straphangers Campaign (Straphangers) and the Automobile Club of New York (Automobile Club), as well as certain individuals, as challenges to the March 6, 2003, decisions of the Metropolitan Transportation Authority (MTA), the New York City Transit Authority (NYCTA) and the Triborough Bridge and Tunnel Authority (TBTA) (collectively referred to as the MTA) to raise bus, subway and commuter railroad fares, to close 62 subway token booths and to increase bridge and tunnel tolls. The MTA appeals from the decisions of the respective IAS courts, which upheld petitioners' claims that the MTA's notices of public hearing contained incomplete, inaccurate or misleading information, thus stifling public discussion of options for closing the MTA's budget gaps other than the fare and toll increases and token booth closings ultimately implemented by the MTA Board. Petitioners-intervenors in the *Automobile Club* proceeding cross-appeal from the court's determination that they lacked standing to assert a claim pursuant to Public Authorities Law § 2804 (1).

The seeds for these cases were planted on November 22, 2002, when the MTA announced that it was ending the 2002 fiscal year with a positive available cash balance of $24.6 million, but was facing a combined budget deficit of $2.8 billion for the 2003 and 2004 fiscal years. The MTA's November announcement included possible options for closing the pending budget gaps, including increases in mass transit and commuter railroad fares and bridge and tunnel tolls, as well as the closure of 177 subway token booths.

According to petitioners, the November announcement of the projected deficits for 2003 and 2004 came as a surprise to a number of public officials and transit watchers. Consequently, State Comptroller Alan Hevesi and New York City Comptroller William C. Thompson, Jr. commenced reviews of the MTA's proposed 2003 and 2004 financial plans and budget proposals.

In the meantime, the MTA proceeded to identify various programs to eliminate the gap (PEGs), which were set forth in an interim financial plan approved by the MTA Board on December 18, 2002 (the December Plan). Included among the MTA's PEGs was $630 million in debt-restructuring cost savings achieved in 2002, which, under the December Plan, would be allocated over both 2003 and 2004 to reduce the combined deficit for those two years. Additional PEGs included various agency budget cuts and increases in projected governmental assistance. As with the $630 million in cost savings, all of the other proposed PEGs, which totaled more than $1.8 billion, were allocated by the MTA over the 2003 and 2004 fiscal years. These PEGs would have the effect of reducing the combined projected deficit for those two years from $2.8 billion to approximately $951 million. The interim December Plan also reiterated a combination of increased tolls and subway, bus and commuter railroad fares, subway token booth closures, and other service reductions as possible solutions for closing that remaining budget gap for 2003 and 2004.

In January 2003, the MTA issued "Notices of Public Hearings on Proposed MTA Fare Increases, Fare Policy Change, Subway Station Booth Closings and Toll Increases." The notices were widely disseminated in print and television media, over the Internet, and on printed flyers, which were made available to anyone requesting information and to anyone who attended any of the hearings. There were a few versions of these notices. Most versions, except for the posters mounted in the subway stations and some newspaper advertisements, announced that the MTA was facing a projected $2.8 billion defi-

cit for 2003 and 2004, noted that a number of internal measures were expected to reduce the projected budget gap for the two years to approximately $1 billion, and listed, in some detail, three options, each of which included a combination of fare and toll increases and service reductions, that were being considered by the MTA to eliminate the remaining deficit. Poster notices displayed in subway stations and some newspaper ads similarly announced that public hearings were to be held on proposals to close a projected $2.8 billion MTA budget gap for 2003 and 2004 and described, in more summary form, the fare- and toll-increase and service-reduction proposals under consideration, but did not mention that internal deficit-reducing measures identified by the MTA would reduce the total projected budget gap to just under $1 billion.

On March 6, 2003, after conducting 10 public hearings at which approximately 350 individuals expressed their views on the MTA's proposals, the MTA Board voted to increase the New York City bus and subway fares from $1.50 to $2, to increase commuter bus and rail fares, to close 62 (not 177, as had been proposed) token booths, and to increase bridge and tunnel tolls by 50 cents. All of these measures were to be implemented in May 2003. A final 2003-2004 financial plan that incorporated these decisions was adopted by the MTA Board on March 27, 2003.

On April 23, 2003, Comptroller Hevesi, having concluded his review of the MTA's financial plans, issued a report and press release (the Hevesi Report), which accused the MTA of maintaining "two sets of books" and "two versions" of its December Plan: the one shown to the public and an internal version, referred to as a "super spread sheet," which revealed that the 2002 "surplus" was really $537.1 million, not the $24.6 million available cash balance reported in November by the MTA, and that $512.5 million of this "surplus" was "secretly" "shifted" to the proposed 2003 and 2004 budgets. Hevesi reported that the internal MTA documents disclosed otherwise "undisclosed" resources from the 2002 budget, including a reserve of $118.2 million; $44.4 million in pension fund prepayment savings; and $10.8 million in interest maintained in a stabilization account, all of which the MTA had allocated to close both the 2003 and 2004 budget gaps.

The Hevesi Report acknowledged that the MTA was facing a combined deficit of approximately $2.6 billion for 2003 and 2004 and that all of the available 2002 resources were being used for legitimate agency purposes, but it surmised that, had

all of those resources been allocated solely to the 2003 budget, a fare hike in 2003 could have been reduced or avoided entirely. However, the Hevesi Report also acknowledged that "[u]se of [all] these resources in 2003 * * * would have widened the 2004 budget gap by an equal amount," and that "it would have been imprudent to use all of the surplus resources in 2003."

Nonetheless, the Hevesi Report criticized the MTA for what it characterized as its failure to fully disclose the availability of the 2002 resources to the public, asserting that "there was far more flexibility in the size and timing of the fare hike than was acknowledged by the MTA" and that the MTA's failure "foreclosed any consideration of fare options other than those proffered by the MTA, which made the public hearing process a sham." Hevesi concluded his report by announcing a plan to promulgate regulations that would require the MTA "to submit its budget and financial plan in a manner that is transparent, reasonable, and timely," and to recommend that the Legislature and Governor enact legislation that would require the MTA in the future to submit its financial plans to the State Comptroller for review before it would be permitted to raise transit fares.

New York City Comptroller William C. Thompson, Jr., also issued a report that was critical of the MTA and its budget processes and recommended that the NYCTA, in conjunction with the MTA, reevaluate the need for a fare increase in 2003.

In a detailed written response to the Hevesi Report, the MTA vehemently objected to Hevesi's characterization of its budgetary process as keeping "two sets of books," explaining that the December Plan it had made public was a presentation document which was intended as a summary and distillation of voluminous backup and explanatory documents, and that the "super spread sheet" was not a separate "set of books" but a detailed version of the summary presentation document. The MTA further explained that allocating 2002 savings to 2003 and 2004 was in conformance with its consistent multiyear financial planning policy, which it had disclosed from the start.

The MTA denied that any of its budgetary allocations were "secret," arguing that its allocation of the $630 million savings gleaned from the 2002 debt restructuring, which included the $512.5 million the Hevesi Report accused the MTA of "secretly" "shift[ing]" to the 2003 and 2004 fiscal year budgets, was reflected in the December Plan and had been disclosed publicly on numerous occasions, including at City Council and state budget hearings. The Authority also objected to Hevesi's

characterization of the public hearings as "a sham," insisting that, "while imprudent proposals were not presented," the MTA's proposals for addressing the projected deficits had been fully disclosed and the underlying information and rationales for those proposals had been fully and fairly presented at the hearings.

Armed with the Hevesi and Thompson reports, the Straphangers petitioners commenced their proceeding on April 30, 2003, challenging the fare increases and token booth closings. Roger Toussaint, the President of Local 100 of the Transport Workers Union of America, the collective bargaining representative of token booth clerks, was granted leave to intervene on behalf of the Union's members whose jobs could be affected by the decision to close the 62 token booths. The IAS court issued its decision in the *Straphangers* case on May 14, 2003 (196 Misc 2d 502 [2003]), and, two days later, the Automobile Club commenced a parallel proceeding challenging the bridge and tunnel toll increases. Vito Fossella, Andrew Lanzer, John Marchi, Matthew Mirones and James Oddo, all public officials who reside in Staten Island and use the City's bridges and tunnels, were granted leave to intervene in the *Automobile Club* proceeding.

In the *Straphangers* case, the court rejected petitioners' claims that the MTA's fare increases violated the "self-sustaining" requirement of Public Authorities Law § 1266 (3) and that the MTA had failed to file a five-year financial plan in violation of Public Authorities Law § 1269-d, rulings which petitioners did not appeal. However, the court found that the purported $2.8 billion deficit "did not exist" and that, consequently, the hearings themselves were deficient because they were based on the "false and misleading premise that the MTA was in worse financial condition than it knew itself to be." (196 Misc 2d at 513.) Based on these findings, the court declared the MTA's notice to be invalid, vacated the MTA's March 6, 2003, vote approving the transit fare hikes and the closing of 62 token booths, ordered that the fares be rolled back to their prior levels, and remanded the matter to the MTA for further proceedings, including new hearings.

In the *Automobile Club* proceeding, the court specifically agreed with the *Straphangers* court's finding that the $2.8 billion did not exist and, based upon that finding, vacated the MTA's March 6, 2003, decision to increase bridge and tunnel tolls. In addition, the court directed the MTA and the TBTA to devise and implement a plan for the reimbursement of toll

increases and remanded the matter to the MTA and TBTA for further proceedings. The court further held that petitioner and intervenors lacked standing to assert a claim under Public Authorities Law § 2804 (1).

Because the MTA's notice of public hearing complied in all respects with the statutory requirements and because the record does not support the findings of both courts that the projected deficit did not exist or that the MTA's notice of public hearing was otherwise false or misleading, we dismiss the petitions.

The MTA is a public benefit corporation created to oversee the mass transportation systems in New York City as well as commuter transportation and related services within the metropolitan commuter transportation district (*see* MTA Act, Public Authorities Law §§ 1260—1279-b). The MTA serves as an umbrella organization for eight operating agencies, including the NYCTA and the TBTA (Public Authorities Law §§ 1261-1279). The NYCTA and TBTA are MTA-affiliated public benefit corporations, each of which is subject to its own statute (*see* Public Authorities Law §§ 550-571; §§ 1200-1221), as well as certain provisions of the MTA Act.

The MTA and the NYCTA are required to operate on a "self-sustaining" basis. That is, they must be able to pay for operating expenses, debt-servicing costs, maintenance, repair and other costs from revenue and other funds actually available to them, and may not operate at a deficit (Public Authorities Law § 1205 [1]; § 1266 [3]). Accordingly, the MTA and the NYCTA have the authority to establish fares and other fees as "may in [their] judgment" be necessary to maintain their operations on "a self-sustaining basis" (Public Authorities Law § 1205 [1]; § 1266 [3]).

Unlike the MTA and the NYCTA, the TBTA, which is authorized to establish tolls and charges for New York City bridges and tunnels, is not required to operate on a self-sustaining basis, and is permitted to generate surplus funds, which, after payment of all bond obligations, operating, administration, and other necessary expenses, may be paid to the MTA or NYCTA to subsidize mass transit (Public Authorities Law § 553 [17]; § 563).

The Public Authorities Law requires the MTA to hold a public hearing before it may establish or change fares (Public Authorities Law § 1266 [3]) and requires the NYCTA to hold a public hearing before it may approve a complete or partial closing of a subway passenger station (Public Authorities Law

§ 1205 [5]). In contrast, the TBTA is not required to give notice of proposed toll increases or to hold any public hearings before implementing such increases (*see* Public Authorities Law §§ 552, 553). Ultimate decision on all these matters is, in any event, committed to the agencies' judgment (Public Authorities Law §§ 552, 553, 1205 [1]; § 1266 [3]).

The requirements for NYCTA and MTA notices of hearing are set forth in parallel sections of the Public Authorities Law, both of which provide in relevant part as follows:

> "Whenever the authority causes notices of hearings on proposed changes in services or fares to be posted * * * such notices shall: (a) be written in a clear and coherent manner using words with common and every day meaning; (b) be captioned in large point type bold lettering with a title that fairly and accurately conveys the basic nature of such change or changes; (c) where such change involves a proposed change in levels of fare, include in its title the range of amounts of fare changes under consideration; (d) contain, to the extent practicable, a concise description of the specific nature of the change or changes, including but not limited to a concise description of those changes that affect the largest number of passengers; * * * (f) where such change involves a partial or complete station closing, such notice shall be posted at the affected station with a clear graphic illustration depicting the nature of any closing for such station." (Public Authorities Law § 1205 [7]; § 1263 [9].)

As the court in the *Straphangers* case acknowledged, the MTA's notices of public hearing complied with the statutory requirements, and petitioners do not contend otherwise. In fact, the notices exceeded the statutory requirements. For example, the statute does not require that the notice of hearing provide any financial information regarding proposed fare increases or station closings, only that it include the "range of amounts of fare changes under consideration" and a "clear graphic illustration depicting the nature of any closing for such station." Yet, all versions of the MTA's notice of hearing informed the public that it was facing a multibillion dollar deficit over the 2003 and 2004 fiscal years. Most versions also informed the public that the MTA had identified various internal measures that would reduce that deficit to under $1 billion and noted that the proposed fare and toll increases and

token booth closures were intended to close that remaining deficit. Although the poster notices that were displayed in subway stations and some newspaper notices did not mention that various internal measures identified by the MTA would reduce the combined 2003 and 2004 deficit, that omission does not render those versions either inaccurate or legally insufficient as the statute does not require that type or level of detail.

Petitioners' essential argument, with which the IAS courts appear to have agreed, is that the MTA should have spelled out in all its notices that its financial plan called for the allocation of all of the 2002 available cash balances—what petitioners and intervenors refer to as the 2002 "surplus"—to both the 2003 and 2004 fiscal years and that, *if* those resources were allocated just to 2003, a fare and toll increase could be avoided in 2003. Putting aside the fact that such one-year planning is contrary to the MTA's multiyear financial planning process, and that petitioners' demand for such disclosure crosses the line from informational desires to interference with discretionary agency policymaking, the governing statute does not require such disclosure. The level of disclosure that a governmental agency must meet is a legislative, not a judicial, decision. The courts are empowered to insure that governmental agencies comply with the letter and the spirit of legislative mandates, but they may not edit such mandates or engraft additional requirements, even if it is believed that such additions would be beneficial to the public (*see e.g. Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]; *Klostermann v Cuomo*, 61 NY2d 525 [1984]). Such amendments, which call for a balancing of the benefits to the public against the administrative burdens and costs to the government agency of more detailed disclosure, may only be made by the Legislature. Here, the Legislature has specified what is required in a notice of hearing. The requirements are sparse, and petitioners acknowledge that they were met. While it may be beneficial to include some financial information in a notice of hearing in order to give context to the proposals being offered for consideration and to enable the public to understand the Authority's asserted reasons for proposing a fare hike or service cutback, the statute does not require such information to be included in the notice. And, although it is certainly within the Legislature's province to mandate that more specific and more detailed information be provided in a notice of hearing issued by the MTA or its affiliated agencies, it is not within the

judiciary's power to do so, at least absent some constitutional imperative, which does not exist here.

We agree that a notice of hearing—even one that meets statutory requirements—that provides the public with false and misleading information may so taint the hearing process as to require invalidation not only of the notice, but also of the hearing and subsequent agency action. However, the records in these cases do not support the IAS courts' determinations that the 2003 and 2004 deficit was "fictional" or that the MTA notices were otherwise false and misleading.

The projected deficit was an estimate of the difference between the MTA's expected revenues and its expenses over the course of the 2003 and 2004 fiscal years. The MTA estimated that deficit to be approximately $2.8 billion. Even the Hevesi Report estimated the two-year deficit to be about $2.6 billion. Given that these are budget estimates, based upon assumptions about as yet unknown future income and expenses, the difference between the MTA's estimate and Hevesi's estimate is immaterial. The salient, undisputed fact is that the MTA faced a combined deficit of over $2 billion for the 2003 and 2004 fiscal years. The record thus does not support either court's conclusion that the multibillion dollar deficit did not exist.

It may be that, if the MTA allocated all of the 2002 cost savings to the 2003 fiscal year's budget, there would be no deficit in 2003 and no need for fare and toll increases and token booth closings in that year. However, there is nothing in the law that requires the MTA to devise its budgets and financial plans on a single-year basis. Indeed, doing so would appear to run afoul of its statutory obligation to establish five-year financial plans (Public Authorities Law § 1269-d). Moreover, as the Hevesi Report recognized, allocating all of the 2002 cost savings to 2003 would have been imprudent and would have only forestalled fare and toll increases for a year. In addition, the MTA's assertion that delaying the fare and toll hikes for a year would have necessitated increases of 42% or more, rather than the 33% increase approved by the MTA, has not been disputed by petitioners.

Although the MTA's notices did not specifically inform the public that its budgetary planning had allocated the 2002 cost savings to 2003 and 2004, not just to 2003, such omission did not render the notices false or misleading. All the MTA's notices disclosed that the projected $2.8 billion deficit was a combined deficit covering 2003 and 2004. Most notices also

informed the public that internal measures—which included allocation of the 2002 cost savings over 2003 and 2004— reduced the combined two-year budget deficit to under $1 billion. While perhaps not as clear as petitioners might have liked, the information in the MTA's notices was neither false nor misleading.

The *Straphangers* petitioners also argue that the MTA notices misled the public because, by the time those notices were issued in January 2003, the $2.8 billion deficit had been reduced to under $1 billion by the PEGs that were included in the December Plan approved by the MTA Board. However, the December Plan and its component parts were only interim measures that were not made final until the MTA Board vote on March 27, 2003. Until the financial plans were finalized, the projected, unreduced deficits remained. In addition, as previously noted, most versions of the MTA's notice of hearing disclosed that internal measures had been identified that would reduce the deficit to under $1 billion.

The *Straphangers* petitioners' additional argument that their First Amendment right to petition the government was abridged by the MTA's assertedly false and misleading notices is raised for the first time on appeal and thus is not properly before this Court (*see e.g. Matter of Attorney Gen. of State of N.Y. v Firetog*, 94 NY2d 477, 484 [2000]). The argument fails in any event in view of our determination that the notices were not false or misleading.

Intervenor Toussaint argues that the MTA Board, which was ultimately responsible for the decision to raise fares and tolls and to close token booths, was not fully informed of the amount and allocation of the 2002 cash savings, and that its decision must, therefore, be vacated. The record does not support his contention. In addition to the MTA budget staff's November 2002 presentation to the Board, the Board was provided with the 200-page December Plan, which included information regarding the amount of the 2002 cost savings and the allocation of those savings over 2003 and 2004, as well as all other essential information regarding the proposed financial plan for 2003 and 2004. Additionally, the Board held hearings where it received input from the public. And, in March 2003, it was again presented with updated information and data regarding the 2003 and 2004 budgets and financial plans. The record thus demonstrates that all information necessary for the Board to make an informed decision was presented. In those circumstances, it is not within this or any other court's authority to

determine the level of detail an agency staff must provide to its governing board or officers in a budget-preparation process. While a court may inquire as to whether an administrative agency had the opportunity to make an informed decision, "in the absence of a clear revelation that the administrative body made no independent appraisal and reached no independent conclusion, its decision will not be disturbed" (*Matter of Taub v Pirnie*, 3 NY2d 188, 195 [1957] [internal quotation marks omitted]). Here, there has been no such "clear revelation."

All of what has been said with regard to the *Straphangers* case applies with even greater force to the Automobile Club's petition since, as previously noted, the TBTA has "unlimited toll-fixing power" (*Carey Transp. v Triborough Bridge & Tunnel Auth.*, 38 NY2d 545, 553 [1976]) and is empowered to raise tolls without any obligation to provide notice or to hold any hearings before doing so (*see* Public Authorities Law §§ 552, 553). In the absence of a legislative directive compelling action by a government agency or some constitutional imperative, the agency is free to conduct its affairs without judicial interference (*see e.g. Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo*, 64 NY2d 233, 239 [1984]).

In addition, the statutory authority governing the TBTA provides it with the "right and duty * * * to charge tolls and collect revenues therefrom, for the benefit of the holders of any of its bonds, notes or other obligations or other liabilities, even if not issued or incurred in connection with" TBTA projects (Public Authorities Law § 552 [2]). The TBTA has issued billions of dollars in bonds that are secured by the toll revenues on TBTA's bridges and tunnels. Those bonds are backed by additional covenants that the toll revenues will exceed the TBTA's debt service. Moreover, New York State agreed, in the Public Authorities Law, that it "will not limit or alter the rights hereby vested in the authority * * * to establish and collect such charges and tolls as may be convenient or necessary to produce sufficient revenue to meet the expense of maintenance and operation and to fulfill the terms of any agreements made with the holders of the bonds, or in any way impair the rights and remedies of the bondholders" (Public Authorities Law § 563 [1]). Any interference with the TBTA's authority to charge or increase tolls effectively undermines the TBTA's assurances to its bondholders in violation of Public Authorities Law § 563. In *Patterson v Carey* (41 NY2d 714 [1977]), a case that dealt with essentially identical statutory provisions authorizing the Jones Beach State Parkway Authority to set tolls, the Court of Ap-

peals struck down a newly enacted law rescinding a toll increase adopted by the Parkway Authority, holding that the law violated the State's statutory promise not to limit or alter the Parkway Authority's statutory right to raise revenues for the benefit, inter alia, of its bondholders. The same rationale applies here, and the IAS court's order requiring the TBTA to roll back the toll increases and refund amounts it had collected in excess of the previous tolls constitutes an impermissible impairment of the TBTA's authority and its bondholders' rights.

The *Automobile Club* intervenors cross-appeal from the IAS court's determination that, although the TBTA was subject to and had violated the financial disclosure requirements of Public Authorities Law § 2804 (1), they lacked standing to assert a claim under that provision. (No cross appeal was taken from the court's parallel determination that petitioner and intervenors lacked standing to assert claims under Public Authorities Law § 1269-d and State Administrative Procedure Act § 202.)

Public Authorities Law § 2804 (1) directs every authority with jurisdiction over highway, bridge or tunnel facilities to submit reports to the Governor and other legislative officials (none of whom is a petitioner or intervenor here) before enacting any increase in tolls. The Court of Appeals, in *Matter of New York Pub. Interest Research Group v New York State Thruway Auth.* (77 NY2d 86 [1990]), struck down as unconstitutional Public Authorities Law § 2804 (2) and (3) because they impermissibly infringed the State Comptroller's discretionary authority. Although it did not specifically invalidate Public Authorities Law § 2804 (1), the Court noted its "questionable constitutionality" (77 NY2d at 88) and the fact that it was "even more intrusive" than Public Authorities Law § 153-c, "an essentially identical statute" (*id.* at 91, 89), which it had previously declared unconstitutional in its entirety in *Patterson v Carey* (*supra*). We need not determine the constitutional validity of Public Authorities Law § 2804 (1) because petitioner and intervenors are not among those officials who are specifically named in the statute as the intended recipients of the reports, and thus lack standing to assert a claim under that provision (*see Matter of Sullivan v Siebert*, 70 AD2d 975 [1979]).

## Conclusion

Although petitioners and intervenors in both the *Straphangers* and *Automobile Club* proceedings insist that their primary complaint is with the MTA's notice of public

hearing, at bottom they object to the MTA's decisions to raise transit fares and bridge and tunnel tolls and to close a number of token booths. Had the MTA decided to allocate all the available savings from the 2002 to the 2003 budget and thus avoid the imposition of any transit or toll hikes this year, it is at best speculative that petitioners and intervenors would be here complaining that the notices were insufficient. Since the law places the ultimate decision on how to balance MTA budgets firmly within the MTA's judgment, a direct attack on those decisions is not possible. But the challenges to the adequacy of the MTA's notices founder on similar shoals as the governing statutes require very little with regard to the content of the notices, and nothing with regard to the amount or kind of information underlying the MTA's budget processes or rationales that must be provided to the public. In this case,.the MTA met the statutory requirements. It is not for this, or any, court to engraft additional requirements onto those the Legislature has determined are appropriate.

While it would be desirable from the public's perspective to have the MTA's budgeting processes be completely transparent and open for detailed inspection and, perhaps, robust public debate, such requirements would impose additional administrative burdens and costs. In either case, the Legislature has determined what is required; whether those requirements should be changed is a political decision for the Legislature to determine after weighing the competing considerations, as Comptroller Hevesi recognized in the conclusions to his report. It is not, however, up to the courts, in keeping with their proper role, to impose requirements that are not provided for in the governing law.

Accordingly, in *Matter of New York Public Interest Research Group Straphangers Campaign, Inc., et al. v Metropolitan Transportation Authority et al.*, the order and judgment (one paper) of the Supreme Court, New York County (Louis York, J.), entered May 14, 2003, which, to the extent appealed from as limited by the briefs, granted the petition to the extent of declaring invalid the MTA's notice of public hearing; vacating the March 6, 2003, vote of the MTA Board to increase bus, subway and commuter railroad fares and to close 62 token booths; reinstating the prior bus, subway and commuter railroad fares; and remanding the matter to the MTA for new hearings, should be reversed, on the law, without costs, and the petition dismissed in its entirety. In *Matter of Automobile Club of New York, Inc. v Metropolitan Transportation Author-*

*ity et al.* the order and judgment (one paper) of the Supreme Court, New York County (Robert Lippmann, J.), entered June 4, 2003, which, to the extent appealed from as limited by the briefs, held that intervenors lacked standing to assert a claim pursuant to Public Authorities Law § 2804 (1), and granted the petition to the extent of declaring the MTA's notice of public hearing invalid; vacating the March 6, 2003, vote of the TBTA's Board to increase the bridge and tunnel tolls; directing the MTA and TBTA to implement a plan to reimburse toll increases; and remanding the matter to the MTA and TBTA for further proceedings, should be modified, on the law, the petition dismissed in its entirety, and otherwise affirmed, without costs.

Motion seeking leave to vacate statutory stay denied as academic.

SULLIVAN, J.P., ELLERIN, LERNER and MARLOW, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered May 14, 2003, reversed, on the law, without costs, and the petition dismissed in its entirety. Motion seeking leave to vacate statutory stay denied as academic.

Order and judgment (one paper), Supreme Court, New York County, entered June 4, 2003, modified, on the law, the petition dismissed in its entirety, and otherwise affirmed, without costs.