[739 NYS2d 127]

In the Matter of NEW YORK PUBLIC INTEREST RESEARCH GROUP
STRAPHANGERS CAMPAIGN et al., Respondents, v LAWRENCE
REUTER, as President of New York City Transit Authority,
et al., Appellants.

First Department, March 7, 2002

## APPEARANCES OF COUNSEL

*Arthur Z. Schwartz* of counsel, New York City (*Kennedy, Schwartz & Cure, P.C.*, and *Eric Schneiderman,* attorneys), for respondents.

*Herbert Teitelbaum* of counsel, New York City (*William J. Hibsher, William M. Heinzen* and *Steven R. Rogovin* on the brief; *Robinson Silverman Pearce Aronsohn & Berman LLP,* attorneys), for appellants.

## OPINION OF THE COURT

RUBIN, J.

At issue on this appeal is whether Public Authorities Law § 1205 (5) requires respondents New York City Transit Authority, its president and the Metropolitan Transportation Authority (collectively, the TA) to give public notice, conduct a public hearing and obtain the approval of a majority of its board of directors prior to eliminating or reducing the hours during which 53 of its token booths are staffed. Because the legislative history of the measure indicates that it is intended to be remedial, this Court affirms the expansive interpretation accorded to the statutory notice provision by Supreme Court.

By letter dated July 2, 2001, respondent Lawrence Reuter notified petitioner Straphangers Campaign that, beginning the following month, the TA planned to reduce staffing at 122 of its token booths. The affected facilities were identified as "secondary booths with low entry and exit volume," and respondent gave his assurance that "there will continue to be a full-time booth, operating 24-hours a day, 7-days a week" at each of the affected stations. Inclusion in the plan "required that the appropriate complement of High Entrance/Exit Turnstiles, MetroCard Vending Machines and other necessary equipment be in place so that our customers would continue to have access to the system." As a consequence of the proposed changes, some entrances remaining open on a 24-hour basis would be without staffing altogether, with access to be provided exclusively by means of High Entrance/Exit Turnstiles.

As described by the TA's Director of Operations for the Department of Subways, the New York City subway system currently consists of 709 token booths, of which 188 are staffed part-time and the remaining 521 full-time. The first phase of the TA's plan, scheduled for implementation on August 26, 2001, calls for staffing reductions in 53 part-time booths: 21 in Manhattan, 19 in Brooklyn, 11 in Queens and 2 in the Bronx.

The plan contemplates the elimination of 35 part-time token booths and a further reduction in the hours of operation at 18 others.

In a letter dated July 3, 2001 to Public Advocate Mark Green, respondent Reuter expressed the TA's position that Public Authorities Law § 1205 (5) does not require a public hearing to be conducted prior to implementation of the proposed staffing reduction plan. The TA adhered to this position at a July 11th hearing before the New York City Council. This proceeding was commenced by way of a petition and order to show cause dated August 10, 2001, seeking injunctive relief. The main allegation of the petition is the TA's violation of Public Authorities Law § 1205 (5). Petitioners also state claims based upon 49 USC § 5307 (d) (1) (I) (relating to respondents' obligation to conduct hearings pursuant to receipt of federal block grants), Public Authorities Law § 1204 (15) (providing that the TA is obligated to operate transit facilities for the convenience and safety of the public), and the Americans with Disabilities Act (42 USC § 12101 et seq.).

Supreme Court, noting that Public Authorities Law § 1205 (5) was enacted during the 1977 fiscal crisis in response to the TA's plan to save money by arbitrarily closing subway entrances, construed it as a remedial measure. The court stated:

> "the Transit Authority is advancing a plan for 'partial closing' of a 'means of public access' to the subway which would impact upon a portion of the public within the meaning of section 1205 (5) of the Public Authorities Law. There is no dispute that the high-turnstile enclosures cannot be used as a means of access into the subway system by significant groups—e.g., mothers or fathers or care givers carrying an infant and a folded stroller, shoppers with numerous packages or bags, injured persons on crutches, people with assisting dogs, or persons with walkers, among others—because the wedge-shaped entry space is simply too small an enclosure for the passenger and whatever accompanies him or her. To such persons, 'access' at a subway entrance only through a high turnstile is no access at all and constitutes an effective closing of that given entrance."

The court agreed with petitioners that the TA must hold hear-

ings before implementing the plan. It dismissed respondent's "argument that the proposed changes are merely a revision in fare collection and sale mechanisms, given that they have an impact upon public access." The court noted that "station access changes have generally been the subject of public hearings held by the Transit Authority * * * including proposals to close unstaffed high-entrance turnstiles because they were so frequently vandalized."

On appeal, the TA contends that Supreme Court misconstrued both the statutory language and the legislative intent: "Nowhere does the Statute mention changes to access within a passenger station, even if these internal changes might advantage some while being viewed as inconveniences by others." The TA argues that, by employing the term "passenger station," the Legislature "plainly indicated that it was not focusing on any one of the many components of a station * * * [I]t is clear that the Statute simply does not address the subject of passage within a subway station." Thus, the TA contends, the court disregarded "the Statute's focus on 'closing' and construe[d] 'access to' as meaning access *within* rather than *to*, a passenger station" (emphasis in original). Respondents conclude that the court "improperly expanded the Statute's scope in order to achieve the social ends" expressed in its opinion.

On appeal, petitioners confine their argument predicated on Public Authorities Law § 1204 (15) to a footnote. Under this provision, the TA is obliged to hold public hearings prior to effecting changes in "routes or methods of transportation." Thus, it reflects the requirements of 49 USC § 5307 (d) (1) (I), which mandates the solicitation of public comment "before raising a fare or carrying out a major reduction of transportation." Petitioners have not pursued the claim predicated upon the Americans with Disabilities Act, the only mention of which is a passing reference in regard to the TA's obligation to operate the transit system for the "safety and convenience of the public" pursuant to Public Authorities Law § 1204 (15).

Public Authorities Law § 1204 (15) grants respondent Transit Authority the requisite power to "manage, control and direct the maintenance and operation of transit facilities * * * for the convenience and safety of the public with power, in its discretion, to extend, modify, discontinue, curtail, or change routes or methods of transportation" upon 30 days' notice to the Board of Estimate. As no change in "routes or methods of transportation" will result from the TA's proposed staffing

reduction plan, this provision (together with the federal provision to which it relates) is inapposite. Petitioners' remaining contention is that "substituting unstaffed turnstiles for token booths closes off a 'means of public access' to passenger stations" and, thus, implicates statutory notice, hearing and voting provisions.

Appellant TA takes the position that Public Authorities Law § 1205 (5), "by its terms, only applies if a subway station is closed completely or partially * * * or if there is a complete or partial closing of 'any means of public access to' a station." The disputed provision states:

> "Any complete or partial closing of a passenger station within the city of New York, or any means of public access to such facility, except for purposes of repair or renovation or in case of emergency shall be accomplished only if approved by resolution of the authority adopted by not less than a majority of the whole number of members of the authority then in office, and only after a public hearing. Such hearing shall be held not less than thirty days after notice of such proposed closing has been given to, and comments solicited from, the community board as established pursuant to section eighty-four of the New York city charter whose area of jurisdiction includes the station proposed to be closed or otherwise affected."

The obvious point of contention, as appellants frame the issue, is the construction to be accorded to "a complete or partial closing of 'any means of public access to' a station." The operative question is therefore whether the restriction of access to a particular class of persons that results from limiting the means of ingress to a full-height turnstile constitutes a "partial closing" of a "means of public access" within the contemplation of the statute.

As stated in *Majewski v Broadalbin-Perth Cent. School Dist.* (91 NY2d 577, 583), " 'It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the legislature' [citations omitted]. As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, *giving effect to the plain meaning thereof*." Thus, " '[in] construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or

contradiction, there is no room for construction and courts have no right to add to or take away from that meaning' " (*id.*, quoting *Tompkins v Hunter*, 149 NY 117, 122-123).

The statute does not, in haec verba, address the *restriction* of access at a particular entry point but instead employs the phrase "partial closing." The TA would limit the meaning of "partial closing" to the hours during which access to a subway station is unavailable at a given entry point. The TA does not interpret the term to embrace the restriction in access that might result from the inability of a class of persons to use the particular means of ingress available at such entry point, whether the restriction is the result of body size, physical impairment or merely the type and number of articles being carried (parents pushing strollers, emergency personnel carrying bulky equipment and the like).

Petitioners argue that "construction should follow the general spirit and purpose of the underlying enactment." They note that, "since 1977, hearings have been held by the TA about such things as 'auxiliary token booth reductions' * * * and a proposal to 'reduce access at unproductive part-time booth locations.' "

We agree with Supreme Court that Public Authorities Law § 1205 (5) is a remedial statute which should not be subject to unduly restrictive construction. As reflected by the June 23, 1977 Memorandum by one of the bill's sponsors, then Assemblyman Jerrold Nadler, the measure was enacted in response to the TA's attempts at reducing costs by closing subway stations and entrances:

> "The Metropolitan Transportation Authority, for budgetary reasons, has decided to close, either entirely or for a large portion of the day, ninety-two subway stations or subway entrances in New York City. The first notice a community receives that a particular subway station is being closed is when iron gates appear in front of the entrances.
>
> "It is felt that a public hearing should be held before the Authority closes a subway station or entrance and that appropriate notice should be given to the Community Board. The voters of New York City last year approved a new City Charter which mandates Community Board consultation or approval for many city actions. This bill is in keeping with the spirit of the new City Charter.

> "It is outrageous that the Metropolitan Transportation Authority* closes subway stations with no notice whatsoever to the community involved. Every community is unique, and the position of each subway station in local community life and traffic patterns is unique. The Metropolitan Transportation Authority should have the benefit of local opinion before finalizing its position with respect to any subway station closing." (Mem in Support of L 1977, ch 930, 1977 NY Legis Ann, at 329.)

This and other memoranda concerning the proposed legislation reflect a statutory purpose to prevent the TA from arbitrarily closing subway stations or restricting access thereto without notice to the public. As the legislative history confirms that the measure is a remedial statute, it should be interpreted broadly (*Blanco v American Tel. & Tel. Co.*, 90 NY2d 757, 766) and "should be liberally construed to carry out the reform intended and spread its beneficial effects as widely as possible" (*Lesser v Park 65 Realty Corp.*, 140 AD2d 169, 173, *lv dismissed* 72 NY2d 1042). "A court, in construing a statute, should consider the 'mischief sought to be remedied' and should favor the construction which will 'suppress the evil and advance the remedy'" (*Lincoln First Bank v Rupert*, 60 AD2d 193, 197, quoting McKinney's Cons Laws of NY, Book 1, Statutes § 95).

It is significant that many of the arguments raised by respondents in this proceeding were previously addressed to the Legislature during its consideration of the proposed amendment to the Public Authorities Law. Appellant Metropolitan Transportation Authority voiced its complaints in a letter dated June 15, 1977:

> "Substantively, the measure is overly restrictive. A hearing must be held on the complete or partial closing of 'any means of public access.' The closing of but one stairway or access way would require a hearing, notwithstanding that access is available just across the street (or indeed abutting the stairway in question)." (Bill Jacket, L 1977, ch 930.)

Respondent New York City Transit Authority stated, in opposition:

> "This bill * * * would prohibit the closing of a sta-

---

* It should be noted that the bill was amended to refer to the New York City Transit Authority prior to its final passage.

tion, in whole or in part, or the closing of public access (except in emergencies) unless so ordered by resolution of the Authority upon majority vote * * *

"The effect of the bill, if enacted, would be to hamper the efforts of the Transit Authority to reduce expenses in times of fiscal crisis by eliminating or curtailing use of stations or entrances where the flow of passenger traffic does not warrant their continuance. The operating officials have expertise in this area and are in the best position to determine the needs of the service." (*Id.*)

That these objections received due consideration is apparent from the Ten-Day Bill Budget Report prepared by the Division of the Budget for the Governor, which states:

"1-2 Subject, Purpose and Summary of Provisions: Requires the New York City Transit Authority (NYCTA) to decide by a majority of the Board, following public hearing, for any complete or partial closing of New York City passenger stations or their access. * * *

"5. Possible Objections to the Bill:

"a. Unlike major policy decisions such as fare increases, these kind of decisions should be delegated to operating officials since they involve the kind of continuous adjustment to program changes required in a large and complex system.

"b. The bill could set a bad precedent in requiring Board decisions on other operating matters such as length of trains, 'headway,' time-scheduling, bus routing and so on.

"c. By requiring passage by a majority of the full Board rather than a majority of a quorum meeting, this particular program area would be raised to a 'super-policy' level, with undue deliberation given to it and with attendant delays—and costs—inevitable." (*Id.*)

In the course of their ultimately unsuccessful opposition to the statute, appellants made, and the Legislature undoubtedly rejected, the same arguments advanced on appeal, both with respect to the availability of alternative subway station

entrances and the effect of the amendment in undermining the TA's authority to curtail the use of stations based on the flow of passenger traffic.

This Court concludes that the notice, hearing and board approval requirements of Public Authorities Law § 1205 (5) were intended to be applicable where, as here, token booth closings are contemplated by the TA and that respondents, in unsuccessfully opposing passage of the legislation, were well aware that, if enacted in its present form, the provision would prevent the TA from expeditiously closing or reducing the operation of subway token booths (*see*, Bill Jacket, L 1977, ch 930). Therefore, the TA must look to the Legislature for any relief.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Diane Lebedeff, J.), entered October 18, 2001, which granted the petition pursuant to section 1205 (5) of the Public Authorities Law to the extent of requiring defendant New York City Transit Authority to give public notice, conduct a public hearing and obtain the approval of its board prior to eliminating or reducing staffing hours at 53 token booths, should be affirmed, without costs.

WILLIAMS, J.P., MAZZARELLI, ELLERIN and LERNER, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered October 18, 2001, affirmed, without costs.