[907 NYS2d 784]

In the Matter of JOHN SAMUELSEN, Individually and as President of Local 100, Transport Workers Union of Greater New York, et al., Petitioners, v JAY WALDER, as Chief Executive Officer of the Metropolitan Transportation Authority, et al., Respondents.

Supreme Court, New York County, June 4, 2010

## APPEARANCES OF COUNSEL

*Schwartz, Lichten & Bright, P.C.,* New York City (*Arthur Z. Schwartz* of counsel), for petitioners. *James B. Henly,* New York City, for Metropolitan Transportation Authority, respondent. *Martin B. Schnabel* and *Florence Dean,* for New York City Transit Authority, respondent.

**OPINION OF THE COURT**

SALIANN SCARPULLA, J.

This CPLR article 78 proceeding concerns when, and under what circumstances, a public benefit corporation, formed to provide the public with a valuable public service, must permit the public to comment on decisions which may have a profound effect on it. In addition, the proceeding concerns whether, and under what circumstances, a court may intervene to enjoin budget decisions made by the public benefit corporation.

Petitioners John Samuelsen, individually and as president of Local 100, Transport Workers Union of Greater New York (the TWU), Bertha Lewis, and the Association of Community Organizations for Reform Now, Inc. (ACORN) (collectively, petitioners) sue for a declaration that the respondents Jay Walder, as Chief Executive Officer of the Metropolitan Transportation Authority (the MTA), and the New York City Transit Authority (the NYCTA) (collectively, respondents) have violated Public Authorities Law § 1205 (5) by attempting to close more than 50 subway station token booths and by closing and attempting to close more than 50 subway station customer assistant kiosks without conducting timely public hearings and without giving timely notice to community boards affected by the proposed and already carried out closings.

Petitioners also seek a declaration that, by attempting to close more than 50 subway station token booths and by closing and attempting to close more than 50 subway station customer assistant kiosks, respondents have violated their obligation under Public Authorities Law § 1204 (15) to operate transit facilities "for the convenience and safety of the public."

Respondent MTA is a public benefit corporation created pursuant to the New York Public Authorities Law for the purpose of "the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district." (Public Authorities Law § 1264 [1].) The governing body of the MTA consists of "a chairman, sixteen other voting members, and two non-voting and four alternate non-voting members . . . appointed by the governor by and with the advice and consent of the senate." (Public Authorities Law § 1263 [1] [a].) The MTA acts as a parent organization to various other entities charged with providing public transportation to New York City and its environs, including respondent NYCTA. Respondent

NYCTA is a public benefit corporation created for the purpose of "the operation of transit facilities . . . on a basis which will enable the operations thereof, exclusive of capital costs, to be self-sustaining." (Public Authorities Law § 1202 [1]; § 1201.)

Pursuant to Public Authorities Law § 1204 (15) the MTA and the NYCTA are granted broad authority to "manage, control and direct the maintenance and operation of transit facilities . . . for the convenience and safety of the public." In addition, pursuant to Public Authorities Law § 1205 (1) and § 1266 (3), the MTA and the NYCTA are granted the authority to "fix or adjust the rate or rates of fare to be charged for the use of any transit facility . . . as may in the judgment of the authority be necessary to maintain the operations of the authority on a self-sustaining basis."

Though the MTA and the NYCTA are given broad authority to fix transit fares and to manage and maintain transportation systems as they may determine, the actions of the MTA and the NYCTA are nevertheless subject to formal public scrutiny. Thus, the MTA and the NYCTA are required by statute to consider community impact and opinion prior to undertaking major changes to the pricing structure or provision of transportation services to the public. As is relevant to this proceeding, Public Authorities Law § 1205 (5) provides that

> "[a]ny complete or partial closing of a passenger station within the city of New York, or any means of public access to such facility, except for purposes of repair or renovation or in case of emergency shall be accomplished only if approved by resolution of the authority adopted by not less than a majority of the whole number of members of the authority then in office, and only after a public hearing."[1]

Whether or not the respondents have fulfilled this statutory mandate of public scrutiny and comment is at the heart of this proceeding.

The History of this Dispute

In November 2008, the Chair and members of the MTA, who also serve as the Chair and members of the NYCTA (together,

---

1. Similarly, Public Authorities Law § 1266 (3) provides that
   "fares, tolls, rentals, rates, charges or other fees for the transportation of passengers shall be established and changed only if approved by resolution of the authority adopted by not less than a majority vote of the whole number of members of the authority then in office, with the chairman having one additional vote in the event of a tie vote, and only after a public hearing."

the Board), were presented with a 2009 budget which contained a wide variety of cost-cutting measures to ensure that the respondents achieved balanced budgets for fiscal year 2009. These proposed cost-cutting measures included fare and toll increases, subway and bus service changes and eliminations, "eliminat[ing] Station Customer Assistant (SCA) agents at 158 control areas," and "eliminat[ing] or reduc[ing] staffing at 42 station agent booths in stations with two or more station agent booths." This array of cost-cutting measures was referred to as "Additional Actions for Budget Balance" (AABB). (*See* affirmation of Florence Dean [Dean affirmation], exhibit B, at 36 ["New York City Transit, 2009 Major Service Reduction Proposals Summary"].)

On December 17, 2008, the Board approved the 2009 budget, which included the proposed AABB. However, implementation of "those actions within the AABB that require public hearing [were to] be brought to the Board for approval subsequent to the conclusion of the public hearing process." (Dean affirmation, exhibit B, Board Resolution of Mar. 25, 2009, para 3.) The MTA, NYCTA and other affiliated subsidiaries and affiliates thereafter notified affected community boards of the AABB. In addition, in January and February 2009, the Board held a number of public hearings concerning the AABB. At those hearings the public was afforded the opportunity to discuss the proposed mass elimination of subway station customer assistant kiosks and subway station token booths, with concomitant mass layoffs of staff.

The Board was hopeful that the State of New York would provide additional funding for fiscal year 2009 so that it could avoid implementing the AABB. By March 2009, however, no state funding had been approved. Accordingly, by resolution dated March 25, 2009, the Board permitted the NYCTA and other affiliates to implement the AABB, including the mass elimination of subway station customer assistant kiosks and subway station token booths.

Subsequently, in or before May 2009, the New York State Legislature did approve additional funding for the MTA and its subsidiaries for fiscal year 2009. Accordingly, on May 27, 2009 the Board adopted a resolution to permit the MTA and its subsidiaries and affiliates to "take all necessary steps to rescind the implementation of the AABB listed in Attachment A to [the May 27, 2009] resolution." (Dean affirmation, exhibit C.)

With respect to the mass elimination of subway service customer assistants and subway token booth clerks and

concomitant mass layoffs of staff, the Board resolved that these eliminations would not be accelerated but would be based, instead, on "attrition only." In short, as of May 27, 2009, respondents rescinded the mass closings of subway station token booths and customer assistant kiosks and instead relied upon reduction of staffing through normal attrition (retirement and voluntary separation).

It is undisputed that, in accordance with the May 27, 2009 resolution, in September 2009, staffing at nearly 100 subway station customer assistant kiosks was eliminated through attrition.[2] In the beginning of 2010, additional subway station customer assistant kiosks were eliminated, again through attrition. There is no indication that, during the period between the May 27, 2009 resolution and May 6, 2010, when Justice Schlesinger issued a temporary restraining order in this proceeding, any subway station token booths were closed or that any subway token booth clerks were laid off.

In December 2009, once again confronted with a bleak economic picture, the Board met in connection with approving a budget for fiscal year 2010. At that time, the Board considered whether to revive the AABB which had been rescinded in May 2009. The Board authorized respondents to conduct fresh hearings with respect to aspects of the previously rescinded AABB. However, with respect to the renewed proposal for mass elimination of subway station customer assistant kiosks and subway station token booths, the respondents decided to not hold new hearings. On December 16, 2009, the Board voted to revive the mass elimination of subway station customer assistant kiosks and subway station token booths.

On February 26, 2010, respondents gave Worker Adjustment and Retraining Notification (WARN) Act notice to the TWU that respondents intended to lay off 477 station agents on May 7, 2010, in connection with mass subway station customer assistant kiosk and token booth closings. The parties to this proceeding have been meeting since then concerning these closings and layoffs. In addition, some time in the beginning of 2010 (the parties' submissions are not clear on this point) respondents distributed leaflets to the general public informing the public of the mass subway station customer assistant kiosk and token booth closings.

---

2. According to respondents, reduction in staff through attrition is achieved through periodic job-picks. There was a job-pick in September 2009.

The Arguments of the Parties in this Proceeding

Petitioners commenced this proceeding by order to show cause on May 6, 2010. On that evening, Justice Schlesinger issued a temporary restraining notice restraining respondents from closing any subway station token booths or laying off any employees necessary to staff those subway station token booths. The parties appeared before me on May 7, and I continued the temporary restraining order.

In their petition, petitioners argue that respondents have failed to comply with their duty under the New York Public Authorities Law to hold public hearings before effectuating the mass closings of subway station token booths and customer assistant kiosks. Petitioners acknowledge that respondents held hearings on these proposed mass closings in early 2009. They argue, however, that because the respondents never implemented those mass closings and layoffs in fiscal year 2009, and because more than a year has passed since those original hearings, the respondents are required by law to hold fresh hearings. This is particularly true, petitioners argue, because the mass closing of subway station token booths and customer assistant kiosks and concomitant mass layoffs are scheduled to occur as part of the 2010 fiscal year, for which there may be new and different concerns on the part of the citizenry.

Petitioners also argue that, by effectuating mass closings of subway station token booths and customer assistant kiosks, respondents have violated their duty under Public Authorities Law § 1204 (15). Petitioners allege that, as a result of the subway station token booth and customer assistant kiosk closings

> "[c]riminal activity, which continues to occur in the subway, particularly violent crimes, which have increased in recent years, will take place outside the view of a TA employee[,] and emergency medical treatment will become far less accessible. Potential acts of terrorism will be harder to detect and deter and acts of terrorism will be harder to deal with."

Petitioners conclude that, by taking these proposed actions, the respondents will violate their duty under Public Authorities Law § 1204 (5) to operate their transit facilities "for the convenience and safety of the public."

For a remedy, petitioners seek an injunction preventing the respondents from closing any subway station token booths or customer assistant kiosks, or laying off employees needed to

staff them, unless and until respondents notify the affected community boards and hold public hearings. Petitioners also seek an injunction preventing respondents from closing any subway station token booths or customer assistant kiosks, or laying off employees needed to staff them, unless "adequate alternative arrangements for the safety and convenience of the public" have been made pursuant to Public Authorities Law § 1204 (15).

In their answer to the petition, respondents raise several arguments. First, respondents argue that petitioners lack standing to commence this article 78 proceeding, because they have not suffered any direct harm, different in kind from the harm suffered by the general public as a result of respondents' actions. Respondents next argue that petitioners' claims are barred by the four-month statute of limitations applicable to article 78 proceedings. Respondents claim that petitioners' claims arose, if at all, in March of 2009, when the Board originally passed the resolution authorizing implementation of AABB.

Finally, respondents argue that they have fulfilled their statutory mandate of permitting public comment on the proposed subway station customer assistant kiosks and token booth closings by holding hearings in early 2009, and that no further public hearings are required.

Standing

Respondents first argue that petitioners John Samuelsen and Bertha Lewis, in their individual capacity, do not have standing to bring this article 78 petition, because they have not alleged injury in fact, i.e., "direct harm, distinct from that of the public at large," when they alleged in the petition they have standing as subway users. In addition, respondents suggest that subway users cannot experience an injury that falls within the " 'zone of interest' sought to be promoted or protected by the statutory provision under which respondents have acted [Public Authorities Law § 1205 (5) and § 1266 (3)]." Respondents further argue that petitioners TWU and ACORN do not have associational standing because TWU and ACORN have not established that any of their members would have standing to sue to enforce a right to a public hearing.

Respondents rely on *Society of Plastics Indus. v County of Suffolk* (77 NY2d 761 [1991]) in arguing for a very restrictive interpretation of standing. The *Society of Plastics Indus.* decision concerned State Environmental Quality Review Act

(SEQRA) litigation. In *Society of Plastics Indus.*, the Court of Appeals took a less than broad view of individual standing for legal challenges to a government or quasi-government body's compliance with SEQRA, because, as the Court of Appeals noted, SEQRA compliance litigation was particularly susceptible to "interminable delay and interference with crucial governmental projects" by "special interest groups or pressure groups, motivated by economic self-interests, to misuse SEQRA." (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 774 [1991]; *see also Matter of Save the Pine Bush, Inc. v Common Council of City of Albany*, 13 NY3d 297, 306 [2009].) The Court of Appeals subsequent decision in *Save the Pine Bush Inc.*, however, made clear that, even in SEQRA compliance litigation, private individuals have standing to sue to force compliance with SEQRA if the private individual shows that his/her use of a "resource is more than that of the general public." (*Matter of Save the Pine Bush, Inc. v Common Council of City of Albany*, 13 NY3d 297, 306 [2009].)

In the non-SEQRA context, New York courts have taken a broader view of both individual and associational standing to challenges to governmental action and inaction. Where a litigant alleges a nonspeculative injury that falls within a protected zone of personal or professional interests, standing is established. (*See Matter of Morgenthau v Cooke*, 56 NY2d 24, 30 [1982] [finding that New York County District Attorney had standing to challenge the manner of designation of judges of the New York City civil and criminal courts to the Supreme Court]; *see also Matter of Fritz v Huntington Hosp.*, 39 NY2d 339, 346 [1976] [licensed doctors of osteopathy who were refused staff privileges at hospital had right to bring suit against hospital for its alleged failure to comply with the Public Health Law].)

Here, John Samuelsen and Bertha Lewis have individual standing to bring this article 78 petition. The argument that the individual petitioners did not allege a special, individualized harm, different from that of the public at large, is misplaced. Public Authorities Law § 1205 (5) protects the right of the riding public to participate and offer input into the decision making by the respondents, decisions which have a direct and substantial impact on the subway rider's ability to have safe, adequate access to transportation in New York City. (*See Matter of New York Pub. Interest Research Group Straphangers Campaign v Reuter*, 293 AD2d 160, 166 [1st Dept 2002] [quoting passages of legislative debate that "(e)very community is unique, and the

position of each subway station in local community life and traffic patterns is unique. The Metropolitan Transportation Authority should have the benefit of local opinion before finalizing its position with respect to any subway station closing"].)

As members of the riding public in areas affected by the proposed mass subway station token booth and customer assistant kiosk closings, petitioners John Samuelsen and Bertha Lewis have a protected interest in ensuring that the respondents comply with their statutorily mandated responsibility of considering the public's views before taking these contemplated actions. Thus, Samuelsen and Lewis have standing to prosecute this article 78 proceeding. (*See Sheldon v New York City Tr. Auth.*, 39 AD2d 950 [2d Dept 1972].)[3]

Respondents also challenge the standing of petitioners TWU and ACORN. Courts accord standing under article 78 to organizations acting in a representative capacity on behalf of their members when: (1) at least one or more members would have had standing as individual petitioners; (2) the claims asserted are "sufficiently germane" to the organization's purposes to establish to the court's satisfaction that the organization is an appropriate representative of those interests; and (3) neither the claim asserted nor the available relief would require the participation of individual members. (*See e.g. Matter of Aeneas McDonald Police Benevolent Assn. v City of Geneva*, 92 NY2d 326, 331 [1998] [finding standing for a police officers' union to bring an action on behalf of its retired members].) The proceeding need not include injured individual parties, and the petition need not specify individual injuries caused by the challenged conduct or decision. (*See National Org. for Women v State Div. of Human Rights*, 34 NY2d 416, 419-420 [1974] [finding NOW to have standing as a bona fide recognized organization representing a class of women with a specific interest in the litigation].)

Petitioner TWU plainly has standing in this case. TWU is a union representing the subway station token booth operators and customer assistant kiosk attendants who are threatened with layoffs, allegedly without a public hearing. TWU has a

**3.** *See also Matter of New York Pub. Interest Research Group Strashangers Campaign v Metropolitan Transp. Auth.*, 196 Misc 2d 502 (Sup Ct, NY County 2003) (court found that "the individuals named as petitioners, who are all transit riders, have standing to challenge the fare hikes and booth closings because they are affected directly by the proposed changes"), *revd on other grounds* 309 AD2d 127 (1st Dept 2003).

direct stake in ensuring that members of the public have an opportunity to offer their opinion as to the need of continued services of the "at risk" TWU members. In addition, complete relief may be awarded without each individual union member being named as a petitioner.

■ Petitioner ACORN is a nationally recognized community organization that is dedicated to pursuing social and economic justice for low- and moderate-income people in about 75 cities across the country. (*See* ACORN's Mission Statement, available at http://www.acorn.org/about/mission.) In commencing this proceeding, ACORN seeks an opportunity on behalf of its members to participate in the allegedly required public hearing to voice its position on continued safe, adequate access to subway service. And, as with the union members, complete relief may be awarded without each individual member of ACORN being named as a petitioner. ACORN therefore also satisfies the three-prong test of associational standing.

The Statute of Limitations

Respondents next argue that the petitioners' claims accrued in March 2009, when the Board originally voted to implement the AABB. In the alternative, respondents argue that even if the decision to implement mass closings of subway station token booths and customer assistant kiosks absent fresh public hearings constituted a violation of Public Authorities Law § 1205 (5), "any claim arising from that final agency action necessarily accrued on December 16, 2009, the date of the [last] Board vote."

Because CPLR 217 designates a four-month statute of limitations for challenges to administrative agency actions, respondents conclude that this article 78 petition was filed outside of the statute of limitations, which at the latest expired on April 16, 2010. In support of this argument, the respondents cite *Matter of Edmead v McGuire* (67 NY2d 714 [1986]), *Rodriquez v City of New York* (55 AD2d 532 [1st Dept 1976]), and *Matter of Best Payphones, Inc. v Department of Info. Tech. & Telecom. of City of N.Y.* (5 NY3d 30 [2005]) for the proposition that "the four-month statute of limitations begins to run from the time an agency action [is] final and binding, . . . as opposed to the subsequent date of its actual implementation." In the alternative, the Transit Authority asserts the doctrine of laches as a ground for dismissal.

CPLR 217 (1) provides that an article 78 proceeding must be commenced within four months of the date of the final determi-

nation. (CPLR 7801 [1]; *Matter of Carter v State of N.Y., Exec. Dept., Div. of Parole*, 95 NY2d 267, 270 [2000].) An agency determination is deemed final when "the agency has issued an unambiguously final decision that puts the petitioner on notice that all administrative appeals have been exhausted." (*Carter*, 95 NY2d at 270.) If the agency creates an ambiguity or indecisiveness in implementing its decision, " 'the courts should resolve any ambiguity created by the public body against it in order to reach a determination on the merits and not deny a party his day in court.' " (*See Mundy v Nassau County Civ. Serv. Commn.*, 44 NY2d 352, 358 [1978], quoting *Matter of Castaways Motel v Schuyler*, 24 NY2d 120, 126-127 [1969].)

Despite respondents' contention, the statute of limitations on petitioners' claims did not begin to run in March 2009. While it is true that in March 2009, the Board voted to implement the AABB, including the mass closings of subway station token booths and customer assistant kiosks and concomitant mass layoffs of staff, in May 2009, the Board rescinded that AABB. At that time, the Board instead determined to accomplish subway station token booth and customer assistant kiosk closings through normal employee attrition over an unspecified period of time.

It was not until December 16, 2009 that the Board voted to reinstitute the mass closing of subway station token booths and customer assistant kiosks and the mass layoffs of staff. However, the December 16, 2009 Board meeting and vote were closed to the public, and it was not until February 26, 2010 that the petitioners were formally notified of the December 16, 2009 Board resolution.[4]

Accordingly, the court finds that petitioners' claim accrued on February 26, 2010. The decisions in *Edmead*, *Rodriquez*, and *Best Payphones* all support this conclusion. These cases expressly hold that claim accrual begins when notice of

---

4. In his affidavit, William E. Cronin, the Vice-President and Chief Officer, Operations Support, for the Department of Subways, states that the NYCTA formally notified the TWU of the December 16, 2009 decision to reinstitute mass subway token booth and customer assistant kiosk closings by letters addressed to John Samuelsen and to the TWU international president James Little, both dated February 26, 2010. The letters notified the union that "(i) it expected to lay off 600 station agents working in multiple locations throughout the City of New York, (ii) the layoffs were expected to be implemented on May 7, 2010, and (iii) the reduction in force was likely to be permanent." The same day, a copy of the letter was mailed to all affected NYCTA employees, together with the Claim for Prior Service and Preference in Retention (DP-323) questionnaire.

the final administrative decision is given, not necessarily the day of the decision itself, as argued by respondents. (*See e.g. Matter of Edmead v McGuire*, 67 NY2d 714, 716 [1986]; *see also Blackman v New York City Hous. Auth.*, 280 AD2d 324, 325 [1st Dept 2001].)[5] Therefore, this petition, initiated on May 5, 2010, falls within the four-month statute of limitations under CPLR 217 (1).

Respondents also argue that this article 78 petition is precluded by the doctrine of laches. Respondents' laches argument is supported only by their attorney's conclusory allegation of "undeniable prejudice to respondents" caused by a two-month delay in the filing of this petition. Such a bare legal conclusion lacks requisite probative value to support the defense of laches. (*See Commissioners of the State Ins. Fund v Ramos*, 63 AD3d 453, 453 [1st Dept 2009].) Respondents' allegation of additional operating expenses on account of this petition is meritless. Inequity cannot arise merely from legal process taking its course.

Respondents' Alleged Violation of Public Authorities Law § 1205 (5)

In their first cause of action, petitioners allege that, in connection with planning for fiscal year 2010, mass closings of subway station token booths and customer assistant kiosks and mass layoffs of staff, as well as other previously abandoned cost-saving measures, were revived and implemented. With respect to some of the revived fiscal measures, e.g., major subway service reductions and elimination of free student fare cards, respondents held fresh public hearings. However, respondents did not hold fresh public hearings with respect to their plans to implement again in 2010 the mass closings of subway station token booths and customer assistant kiosks. It is this failure to hold fresh public hearings, petitioners argue, which violates Public Authorities Law § 1205 (5).

---

**5.** In a footnote, respondents make a vague argument that petitioners must have known about the December 16, 2009 Board resolution because there was "a plethora of public information available" and because of the "presence of a senior officer of the TWU as a member of the respondents' board." It is respondents' burden to prove that notice was given to petitioners. (*See Berkshire Nursing Ctr., Inc. v Novello*, 13 AD3d 327 [2d Dept 2004].) Respondents have not submitted any supporting proof concerning the alleged knowledge by petitioners of the December 16, 2009 resolution prior to February 26, 2010. The only competent evidence submitted shows that respondents gave at least some of the petitioners formal written notice of the decision to revive mass closings of subway station token booths and customer assistant kiosks on February 26, 2010.

Respondents respond to this argument in two ways: first, they claim that they have fulfilled their statutory mandate by holding hearings on proposed mass subway station token booth and customer assistant kiosk closings in early 2009. Second, respondents claim that they do not have a statutory obligation to hold public hearings with respect to the proposed mass subway station token booth and customer assistant kiosk closings.

Turning to the second argument first, despite respondents' attempt to distinguish it, the Appellate Division, First Department, decision in *Matter of New York Pub. Interest Research Group Straphangers Campaign v Reuter* (293 AD2d 160 [2002]) is directly on point and compels the conclusion that respondents' decision to effectuate mass token booth closings and customer assistant kiosks is subject to the public hearing requirement of Public Authorities Law § 1205 (5).

In *New York Pub. Interest Research Group v Reuter*, the petitioners argued that, by laying off and limiting staff at subway station token booths, the NYCTA was effectuating a "partial closing" of a subway station, triggering the public hearing requirement of Public Authorities Law § 1205 (5). The NYCTA posited a very restrictive interpretation of Public Authorities Law § 1205 (5), one that would limit the statute's applicability to only those circumstances where there was a complete or partial closing of access to a subway station. The NYCTA argued that the Public Authorities Law § 1205 (5) hearing requirement was not triggered by a reduction in staffing at the subway station token booths, because of the availability of high entrance/high exit turnstiles at the affected subway stations for access into the stations. (*New York Pub. Interest Research Group v Reuter*, 293 AD2d at 163-165.)

The First Department rejected the NYCTA's restrictive interpretation of Public Authorities Law § 1205 (5), and held that "the notice, hearing and board approval requirements of Public Authorities Law § 1205 (5) were intended to be applicable where, as here, token booth closings are contemplated by the TA." (*New York Pub. Interest Research Group v Reuter*, 293 AD2d at 168.) Like the contemplated subway station token booth closings and staff reductions at issue in *New York Pub. Interest Research Group v Reuter*, the contemplated mass subway station token booth and customer assistant kiosk closings at issue here are subject to the public hearing requirement of Public Authorities Law § 1205 (5).

The crux of respondents' defense to this article 78 petition is that they have fulfilled their statutory requirement by holding public hearings on the AABB in early 2009. Further, respondents argue that, unlike the other AABB which were rescinded and then revived (triggering a new requirement for public hearings), the subway station token booth and customer assistant kiosk closings were never rescinded, merely implemented in a different manner. Respondents conclude that, because only the "means and methods" of performing the subway station token booth and customer assistant kiosk closings were affected, no fresh hearings are required.

As in *New York Pub. Interest Research Group v Reuter*, whether petitioners have made out a violation of Public Authorities Law § 1205 (5) depends, in part, on whether one takes a restrictive or more expansive view of the statute. In *New York Pub. Interest Research Group v Reuter*, the First Department held that "Public Authorities Law § 1205 (5) is a remedial statute which should not be subject to unduly restrictive construction." (293 AD2d at 165.) Instead, the statute should be "interpreted broadly and 'should be liberally construed to carry out the reform intended and spread its beneficial effects as widely as possible.' " (*New York Pub. Interest Research Group v Reuter*, 293 AD2d at 166 [citations omitted], quoting *Lesser v Park 65 Realty Corp.*, 140 AD2d 169, 173 [1st Dept 1988].)

The public hearing requirement set forth in Public Authorities Law § 1205 (5) should be broadly construed because it is essentially the only effective, direct method by which the public may influence the decisions of respondents, decisions which may have a profound effect on the public. The pressing issues surrounding the public in 2010, including a lack of funding to maintain transportation services as well as safety from terrorist attacks and other criminal activity, militate in favor of broad public comment on the decision whether to effectuate the mass closings of subway station token booths and customer assistant kiosks.

Given the First Department's mandate that Public Authorities Law § 1205 (5) should be liberally construed, respondents' argument that they complied with the statute's requirement by holding hearings on the after-abandoned AABB in January 2009 is untenable. Like their decision to reimplement other cost-saving measures which were abandoned in May

2009, respondents' decision in December 2009 to reimplement mass subway station token booth and customer assistant kiosk closings and concomitant layoffs, instead of achieving the desired cost savings through normal attrition (as planned in May 2009), required public hearings.

By couching their decision to reimplement mass subway station token booth and customer assistant kiosk closings in 2010 as merely a different way to achieve a plan already publicly discussed in 2009, respondents take an unduly cramped and restrictive view of their actions and of the public hearing requirement. Closing subway station token booths and customer assistant kiosks through mass subway station token booth and customer assistant kiosk closings and concomitant layoffs is a much harsher and immediately felt action than doing so through untimed employee attrition. That difference is meaningful and important. Certainly, the riding public may not object to the latter, but have strong objections to the former.

As of May 2009, respondents had informed the public that the earlier plan for mass subway station token booth and customer assistant kiosk closings was not going to be implemented. Once the respondents decided, almost a year later, to reimplement that plan, new public hearings were required.

Subway station closings are one type of action which has been singled out by the Legislature as an MTA/NYCTA decision which must be accompanied by public hearings. Respondents argue that the mere passage of time is an insufficient ground upon which to require them to hold additional public hearings. More than one public hearing may not be required in every conceivable subway station token booth closing. However, where, as here, the MTA and NYCTA first inform the public that subway station token booth and customer assistant kiosks are going to be closed through mass closings and layoffs, then later inform the public that the closings and layoffs are going to occur through attrition—not mass closings and layoffs—and then almost a year later decide again that there will be mass subway station token booth and customer assistant kiosk closings, that later decision triggers a statutory obligation to allow the public to again comment.

Accordingly, petitioners have successfully shown that respondents violated Public Authorities Law § 1205 (5) by failing to

hold public hearings on the contemplated subway station token booth and customer assistant kiosk closings.[6]

**Respondents' Alleged Violation of Public Authorities Law § 1204 (15)**

In their second cause of action, petitioners allege that the closing of subway station booths would violate respondents' statutory obligation to promote the safety and convenience of the public as set forth in Public Authorities Law § 1204 (15), which provides,

> "To exercise all requisite and necessary authority to manage, control and direct the maintenance and operation of transit facilities transferred to it for the convenience and safety of the public with power, in its discretion, to extend, modify, discontinue, curtail, or change routes or methods of transportation where the convenience and safety of the public would be served thereby or where existing routes or methods are inefficient or uneconomical; provided, however, that (except in cases of emergencies) at least thirty days prior to any proposed modification, discontinuance, curtailment or change of any transit route or method of transportation, the authority shall give notice of its intention to the board of estimate and shall, upon request of such board within such period, conduct a public hearing thereon."

The respondents were created by the New York State Legislature to perform what is an essentially governmental function—operating the transit system in New York City. (*See* Public Authorities Law §§ 1201, 1202; *Adams v New York City Tr. Auth.*, 211 AD2d 285 [1st Dept 1995], *affd* 88 NY2d 116 [1996].) They must establish priorities and allocate resources in order to perform their responsibilities, and such exercise of their judgment is generally not subject to judicial review. (*McKechnie v New York City Tr. Police Dept. of N.Y. City Tr. Auth.*, 130 AD2d 466, 468 [2d Dept 1987]; *Nemser v New York City Tr. Auth.*, 140 Misc 2d 369 [Sup Ct, NY County 1988].)

As Public Authorities Law § 1204 (15) and § 1205 (5) make clear, the riding public's avenue of challenging respondents' ac-

---

**6.** To the extent that petitioners seek in the amended petition retroactive relief with respect to subway station token booths and customer assistant kiosks which have already been closed through attrition, this claim is barred by the four-month statute of limitations. In any event, petitioners have not shown that this action violates Public Authorities Law § 1205 (5).

tions is the public hearing process. Questions as to the extent and manner in which the NYCTA and MTA operate and manage the transit facilities "for the convenience and safety of the public" are within the purview of those agencies and not subject to judicial review. The relief sought by the petitioners in their second cause of action herein would involve the judiciary in the management and operation of the New York City transit system, a task the courts are not designated to perform. (*See e.g. Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo*, 64 NY2d 233 [1984]; *McKechnie*, 130 AD2d 466 [1987]; *Jamaica Chamber of Commerce v Metropolitan Transp. Auth.*, 159 Misc 2d 601 [Sup Ct, Queens County 1993].)

Notably, petitioners have not pointed to a single case in which the courts have enjoined the NYCTA's alleged violation of Public Authorities Law § 1204 (15). The cases cited by petitioners to support their argument all involve article 75 proceedings and are inapposite. (*See Matter of New York City Tr. Auth. v Transport Workers Union of Am.*, 279 AD2d 474 [2d Dept 2001]; *Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO*, 280 AD2d 677 [2d Dept 2001]; *Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO*, 243 AD2d 567 [2d Dept 1997]; *Matter of New York City Tr. Auth. v Transport Workers Union of Am., AFL-CIO, Local 100*, 220 AD2d 749 [2d Dept 1995].)[7]

Accordingly, petitioners' second cause of action is denied and dismissed.

In accordance with the foregoing, it is hereby ordered that the petition is granted to the extent that respondents are enjoined from effectuating the mass closings of subway station customer assistant kiosks and token booths unless and until

---

**7.** In the cases cited by petitioners, the intermediate appellate courts relied, in part, upon Public Authorities Law § 1204 (15) to review arbitration awards in which arbitrators awarded lesser penalties than those imposed by the NYCTA on employees who engaged in unsafe work practices. Subsequently, the Court of Appeals held that the courts may not overturn arbitration awards, issued pursuant to collective bargaining agreements, by relying on the "public policy" set forth in Public Authorities Law § 1204 (15). (*See Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO*, 99 NY2d 1 [2002], *revg* 279 AD2d 474 [2d Dept 2001]; *Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO*, 280 AD2d 677 [2001].)

respondents post appropriate notices and hold the public hearings required by Public Authorities Law § 1205 (5); and it is further ordered that the petition is otherwise denied.